SPELTZ GRAIN & COAL COMPANY v. ED RUSH, ILLINOIS
CENTRAL RAILROAD COMPANY, AND OTHERS.[1]

February 8, 1952.

No. 35,525.

[1]Reported in 51 N. W. (2d) 641.

*Meighen, Knudson, Sturtz & Peterson,* for appellant.

*Elmer R. Peterson,* for respondents Ed Rush, Alfred Larson, and Joe Libersky.

*J. H. Wright,* General Counsel, *C. A. Helsell,* General Solicitor, *Catherwood, Hughes & Alderson,* and *Burnquist, Helsell & Burnquist,* for respondent Illinois Central Railroad Company.

MAGNEY, JUSTICE.

On and prior to November 7, 1949, plaintiff owned and operated a plant consisting of an elevator, feed mill, coal shed, corn crib, and oil station at London, Minnesota, an unincorporated prairie village with a population of about 125 located on a line of defendant Illinois Central Railroad Company. The individual defendants were members of the railroad's section crew. Plaintiff claims that defendants jointly, recklessly, wantonly, culpably, and wilfully set fire to inflammable material on the right of way of the railroad company in the vicinity of plaintiff's plant, that they failed to backfire or use other means at hand to avoid injury to plaintiff's property, and that as a result plaintiff's plant was wholly destroyed by fire on

that date. Defendants specifically deny that they jointly, recklessly, wantonly, culpably, and wilfully set the fire which destroyed plaintiff's plant, and claim that the acts of defendants were the usual and ordinary acts of the railroad and its employes in maintaining the railroad at the time and place referred to.

As a further defense, the company alleged that plaintiff was its tenant and that the buildings referred to were located upon the right of way of the railroad company; that plaintiff occupied the premises under a written lease under the terms of which it assumed all liability for harm from loss by fire, whether caused by defendant lessor or its employes, and agreed to indemnify said defendant against any damage or loss by reason of fire. The lease was executed July 10, 1936. The separate answers of the individual defendants make similar allegations.

At the close of the testimony, the court directed a verdict for defendants, and plaintiff appeals from an order denying its motion for a new trial.

Over the years, every year or two, it had been the practice of the section crew of the railroad company to burn the dry grass and weeds on its right of way. On the morning of November 7, 1949, about nine o'clock, a crew of five men started to burn on the south side of the right of way, commencing from a quarter to a half a mile northwest from London and working toward the village. As the right of way approaches and passes through London, the main line of the railroad runs northwest and southeast. Burning proceeded according to the instructions of defendant Ed Rush, the foreman. He remained on the track to see that the fire did not jump to the north side. Defendant Alfred Larson walked along the south right-of-way fence, setting fires with a torch. He was the only one setting fires. Larson would set fire to a strip from a rod to 40 feet in width and then watch it burn up to the grass line, which was about three feet from the end of the ties. There was gravel between the grass line and the ties. The distance from the fence to the ties was about 45 feet. After a strip had been burned up to the grass line, Larson would apply the torch to the next strip. Each strip brought the

burned area closer to London. Because of the difference in amount of dry vegetation, the amount of flame and smoke also varied. Two of the men walked along the south fence with switch brooms, putting out fires that were working back toward the field beyond. The fifth man came along behind the others and extinguished the fires on the posts and poles.

Broad street in London runs north and south and crosses the railroad company's tracks just east of plaintiff's plant. The right of way across the tracks from the burned area, as well as the fields beyond to the north right-of-way fence, also had a covering of dry grass and weeds. At no point did the fire jump to the other side of the track, and no grass or weeds on the north side thereof were ignited.

West of plaintiff's elevator building were two coal sheds or bins. About 275 feet west of the more westerly coal shed, a spur track branched from the main line easterly toward plaintiff's buildings. The distance between this spur track and the main line immediately in front of plaintiff's buildings varied from 30 to 40 feet, the enclosed area widening toward the east. This space was also covered with dry grass and weeds. No fire touched this area. Defendants' witnesses testified to the effect that when the section men came to a point directly south of the spur switch Larson set the fires next to the track instead of near the right-of-way fence. Plaintiff's witnesses say that they saw no backfiring at this point. When the crew had proceeded with the burning to a point 300 feet east of Broad street, a flame two or three inches high appeared in the coal dust in front of the coal door near the southwest corner of the westerly coal bin. Sometime between 10:30 and 11 a. m., fire was seen in the southwesterly corner of the west coal bin itself. This coal bin contained about 30 tons of bituminous coal. A door about four feet from the west end of the bin was open. In a few minutes the elevator was on fire and all the buildings were destroyed. No fire started in the village north of the tracks, except such as came from the elevator fire. There had been no rain or snow in the vicinity for some time, and the vegetation was very dry.

Plaintiff's witnesses testified that a strong wind was blowing when the men started to burn the right of way. They estimated the wind velocity that forenoon to be from normal and medium to 30 or 40 miles per hour. All witnesses agreed that the wind direction was generally from southwest to northeast, that is, directly across the track. The official report from the weather bureau at Austin, 14 miles northeast of London, and in direct line with the wind direction from London, showed that the wind velocity at 9 a. m. was 8 miles per hour, at 10 a. m., 9 miles per hour, at 11 a. m., 12 miles per hour, and at 12 noon, 15 miles per hour. Paul Eugene Kusek, a witness for plaintiff, who took the readings at the Albert Lea airport, testified that Austin, being northeast of London, would have very nearly the same wind velocity as London, "unless there was some local storm." The recorded wind velocity that forenoon at the Albert Lea airport was 14 miles per hour at 9 a. m., 8 miles per hour at 10 a. m., and 8 miles per hour at 11 a. m. At 12 noon it had increased to 21 miles per hour. Albert Lea is about 25 miles northwest of London. At Mason City, Iowa, about 30 miles southeast of London, the official weather report showed 14 miles per hour at 8:28 a. m., 13 miles per hour at 9:28 a. m., and 15 miles per hour at 10:28 a. m.

The individual defendants were experienced section hands. Ed Rush at the time of the trial had worked on the section for 24½ years and had been foreman for 8 years, Larson had worked as section hand for defendant company 30 years, and Libersky 29 years.

■ Plaintiff's buildings occupied a part of the railroad company's right of way under the terms of a written lease which contained these provisions:

"The Lessee [plaintiff here] further agrees that * * * he will exercise such care, and cause such precautions to be taken, as shall adequately protect the buildings and structures on said demised premises * * * against all dangers to which they may be exposed from fire, by reason of the proximity of said premises to the railroad operated by the Lessor, and the movement or use of locomotive engines and cars upon its tracks—*the risk of all loss, injury and*

*damage by fire, however caused, and whether or not caused by the negligence of the Lessor, its agents or servants, being hereby assumed by the Lessee, who, in consideration of the leasing of said premises on the terms aforesaid, hereby agrees to indemnify and save harmless the Lessor from all liability for damage by fire, however the fire may originate, the risk of which is assumed as aforesaid."* (Italics supplied.)

Applying the provisions of the lease as above quoted to the facts of the case as we have detailed them, the question presented is whether the court erred in directing a verdict for defendants.

Plaintiff contends that the lease refers to certain fires, not to all fires, and that the provision which attempts to shield the railroad company and its servants does not include a shield against plaintiff's cause of action as set out in the complaint and as proved at the trial. It contends that the exemption from liability is limited to fire by reason of the proximity of the premises to the railroad operated by the lessor and the movement or use of locomotive engines and cars upon its tracks; that keeping the weeds down has no connection with the movement or use of locomotive engines or cars upon its tracks; and, although it has a remote connection with maintenance, it has none with operation.

We are unable to read or interpret the language of the lease as desired by plaintiff. The words of the lease are that "the risk of *all loss,* injury and damage *by fire, however caused,* and whether or not caused by the negligence of the Lessor, its agents or servants, being hereby assumed by the Lessee, who, in consideration of the leasing of said premises on the terms aforesaid, hereby *agrees to indemnify and save harmless the Lessor from all liability for damage by fire, however the fire may originate,* the risk of which is assumed as aforesaid." (Italics supplied.) The above italicized words must be interpreted as all-inclusive and as shielding the railroad company from all loss or damage by fire, however caused. Any other interpretation would ignore the plain meaning of words.

Plaintiff contends that, even if the terms of the lease exempt the company from liability from fires set in the course of maintenance,

the company could not validly contract for exemption from liability for reckless, wanton, and wilful acts. The complaint alleges that defendants, "acting jointly, recklessly, wantonly, culpably and wilfully set fires * * * and jointly failed to * * * use * * * means at hand to avoid injury to plaintiff's said property, * * * well knowing that said plant, its parts and contents were in a position of great danger from said fires * * *." Plaintiff contends that the evidence supports the above allegations of the complaint, and, since it does, that the company has failed to secure exemption under its lease.

■ It is well settled that a railroad company may, in leasing its own property, insert terms exempting it from liability for loss to the leased premises from fires caused by its own or its employe's negligence. James Quirk Milling Co. v. M. & St. L. R. Co. 98 Minn. 22, 107 N. W. 742; Commercial Union Assur. Co. Ltd. v. Foley Brothers, 141 Minn. 258, 169 N. W. 793; N. P. Ry. Co. v. Thornton Brothers Co. 206 Minn. 193, 288 N. W. 226; Michigan Millers Mut. F. Ins. Co. v. Canadian Northern Ry. Co. (8 Cir.) 152 F. (2d) 292; see, extensive Annotation, 175 A. L. R. 8, at p. 94. We have held that a lease such as here involved violates no rule of public policy and is therefore valid. Commercial Union Assur. Co. Ltd. v. Foley Brothers, *supra*, and cases above cited. The question was fully considered in the recent case of Pettit Grain & Potato Co. v. N. P. Ry. Co. 227 Minn. 225, 35 N. W. (2d) 127. One of the reasons for the rule as applied to railroad companies is that they owe no duty to the public to exercise care with respect to buildings on their own rights of way, and that they may exact their own terms in granting permission to place them there. Leases of that nature involve ordinary contractual matters in which the public welfare is not concerned. In making such leases, the railroad company acts not as a common carrier performing duties imposed upon it as such by law independent of contract, but rather as any other owner of property.

In the Pettit case, we held that a provision in a lease similar to the one involved in the instant case was valid, where by statute

requiring railroad companies to equip locomotives with good and efficient spark arresters a railroad company is subject to a penalty for violation thereof and the employe responsible for the violation is guilty of a misdemeanor. We also held in that case that statutes amending and supplementing prior statutes so as to provide for a more severe penalty against railroad companies for violation thereof, for more drastic criminal liabilities against certain railroad employes in such cases, for making railroad companies also criminally liable in such cases, for absolute civil liability on the part of railroad companies for fires set by their locomotives instead of liability for negligence, and for authority to railroad companies to procure insurance to protect themselves against liability for such fires *do not evince a public policy rendering invalid a bargain for such exemption from liability*. In the Pettit case, where the fire was set by sparks from a locomotive, we said (227 Minn. 235, 35 N. W. [2d] 133) :

"It was * * * permissible as a matter of public policy for a railroad company and a lessee of part of its right of way to stipulate in the lease for the former's exemption from liability for loss caused by fire set by its locomotives, even though such fire might be the consequence of acts of the railroad company's servants made criminal by statute."

We called attention to the fact that any liability of a corporation for the acts of its servants which its governing authority has not commanded or directed is a vicarious one. The Pettit case disposes of plaintiff's argument that in setting the fire involved in the instant case certain statutes of this state were violated and that therefore the railroad company cannot make a valid contract for nonliability for such acts.

■ Plaintiff contends that the railroad company as a landlord cannot make a valid contract with its tenant providing for nonliability for the reckless, wanton, culpable, and wilful acts of the railroad company and its servants which result in damage to the tenant's property. It is not necessary, however, to discuss or de-

termine whether the railroad company may validly contract with a tenant against such acts, because, in our opinion, the facts of the instant case do not substantiate plaintiff's claim that the acts complained of were reckless, wanton, culpable, and wilful.

A brief résumé of the facts which we have already recited in detail refutes plaintiff's claim. The section foreman supervised the burning. Only one of the men was setting fires, and he set only a narrow strip at a time. He did not light another until the first had burned out. Two men kept the fire from crossing the south line of the right of way to the fields beyond. One man put out the fires on poles and posts. The fire was at all times under control. At least three of the men were old section hands and had had years of experience. No fire from the burning south of the tracks kindled the area of the right of way north of the tracks or the fields beyond, or between the main line and the spur track to the north, although the vegetation was of the same kind and the wind direction directly that way. The evidence shows that the section crew was doing the work as experienced men with proper intentions, and, except for the spark or sparks which ignited the coal and which by fair inference came from the fire on the right of way, the fire was under such control that nothing was burned except what the crew intended to burn. The evidence does not support the claim of plaintiff that the section crew acted "recklessly, wantonly, culpably and wilfully" in burning the dry grass and weeds on the right of way of defendant company.

Order affirmed.