**WHIRLPOOL CORPORATION, a Delaware corporation, Plaintiff,**

**v.**

**Leland S. MORSE and Arthur Kraniger, Jr., co-partners doing business as Morse Tuckpointing Company and Morse Tuckpointing Co., Inc., a Minnesota corporation, Defendants.**

**No. 3-62-Civ. 287.**

United States District Court
D. Minnesota.
Third Division.
June 13, 1963.

James P. Miley and Israel E. Krawetz, St. Paul, Minn., for plaintiff.

James Geraghty, St. Paul, Minn., for defendant Morse Tuckpointing Co.

LARSON, District Judge.

This matter came on for trial before the Court without a jury and was tried April 26 and April 29, 1963. Firestone, Fink, Krawetz, Miley and O'Neill, by Messrs. James P. Miley and Israel E. Krawetz, appeared on behalf of the plaintiff Whirlpool Corporation; Altman, Geraghty & Mullaly, by Mr. James Geraghty, appeared on behalf of the defendant Morse Tuckpointing Co. The Court having heard the evidence and having considered the oral and written arguments of counsel, and being fully advised in the premises, now makes the following Findings of Fact, Conclusions of Law and Order for Judgment.

## FINDINGS OF FACT

### I.

Plaintiff is a Delaware corporation, having its principal place of business in Chicago, Illinois, and is engaged in the manufacturing business. The plaintiff operates a manufacturing plant in St. Paul, Minnesota. The defendant is a Minnesota corporation, having its principal place of business in St. Paul, Minnesota, and is engaged in building restoration and repair work.

### II.

This Court has jurisdiction under 28 U.S.C. § 1332 by reason of the diversity

of citizenship between the parties and the fact that the amount in controversy exceeds the sum of $10,000 exclusive of costs and interest.

### III.

On or about August 24, 1956, the plaintiff decided to have certain sandblasting done on exterior masonry elevations on one of its buildings in St. Paul, Building Number 17, and upon completion of the sandblasting, to have the masonry repaired and waterproofing applied to all the outside masonry surfaces which were to be sandblasted.

### IV.

The matter was discussed with the defendant Morse Tuckpointing Company and thereafter the Morse Tuckpointing Company did submit an offer in writing to perform the work. In the written offer, the price was quoted and the work to be done described. The offer contained also the following: "The above quoted prices include all operations; complete insurance coverage, wages, material, taxes, equipment, power tools, and any other expense necessary to complete a first class job. Water and electricity to be furnished by the building owner. The cleaning of windows is not included in this proposal. * * * Work to be executed in a neat and workmanlike manner. All work to be done by men fully insured, thoroughly experienced and specializing in this particular type of work. * * * This is highly specialized work and if desired, we will provide a safe and easy way for you or anyone representing you to inspect this work as it progresses." The offer had a space typed in for signature and acceptance by the plaintiff.

### V.

██ The defendant's proposal to the plaintiff was not signed and accepted by the plaintiff in the space provided on the proposal. Instead, the plaintiff submitted a purchase order to the defendant, which the defendant accepted. This document constitutes the written contract between the parties with regard to the cost of the work. The purchase order did not contain any of the above mentioned terms and conditions as to the work being done in a neat and workmanlike manner by experienced workmen, but the parties probably still felt and the Court finds that the defendant was bound by these warranties in its proposal. The purchase order did provide, inter alia, as follows:

"14. COMPLIANCE WITH LAWS —The seller agrees to comply with all applicable state, federal and local laws and executive orders and regulations issued pursuant thereto."

### VI.

The defendant's insurance policies did not contemplate defense of third parties against suits such as brought by defendant's employee Kruezkemper against the plaintiff here. With that exception, the defendant's policies in force on April 10, 1957, provided complete insurance coverage. Prior to submitting the purchase order to the defendant, the plaintiff requested that the defendant submit all of its insurance policies to the plaintiff for examination. The plaintiff was fully aware at the letting of the contract that the defendant's insurance policies did not include provision for defense of suits such as was brought by Mr. Kruezkemper.

### VII.

The work was to be done on Building No. 17, attached to the side of which is a conveyor housing. The roof of this conveyor housing is about 60 feet above the ground. Below this conveyor housing is another conveyor roof. The upper conveyor roof was pitched. For the apparent purpose of facilitating walking along the pitched roof, there were 2 x 4's running the entire length of the roof near its center. These 2 x 4's were attached to the roof by metal cleats held in position by 1/4 inch steel bolts. The roof was made of corrugated steel.

### VIII.

The contract was dated October 9, 1956, and some work was done by the defendant

in the fall by some of the same employees who returned in the spring of 1957 to complete the work. On April 10, 1957, a crew of three of the defendant's employees came to Building No. 17 to engage in the work, one of whom was Eugene L. Kruezkemper. Mr. Kruezkemper had been at the building the previous fall and had walked along the roof in question then and, in fact, had walked along the roof in question the day before. Mr. Kruezkemper was experienced in working in high places, having been engaged in this general type of work for eight years.

## IX.

In doing the waterproofing work the men worked from a stage swing which was suspended from the roof of the building. They would start working at the top of the building and gradually work down. From their position on the swing the men were able to waterproof a width of about twenty feet of the wall and then the swing would have to be moved over. The men had begun waterproofing on the east side of the south wall of the building and by about 11:30 A.M. on April 10, 1957, had moved the swing from right to left (east to west) about four times. To accomplish each move Mr. Kruezkemper had gotten off the swing, walked along the 2 x 4's to the west to a window, gained access to the building interior, and proceeded to the roof where he performed the necessary adjustments to the boom equipment which held the swing in place. About 11:30 A.M. Mr. Kruezkemper planned to leave the swing and proceed down the conveyor housing roof to the window, either because the snow which had begun to fall was forcing the termination of the work or because it was again time to move the swing. Mr. Kruezkemper was wearing shoes with Neolite soles. He stepped off of the stage and took one step on the 2 x 4's, when one of them broke and caused him to lose his footing and fall to the ground about sixty feet below. Mr. Kruezkemper suffered severe injuries and was in the hospital for three and one-half months.

## X.

Mr. Kruezkemper received the benefits of Workmen's Compensation and some four years later filed a suit in tort against the Whirlpool Corporation, the plaintiff here, pursuant to the third-party provisions of the Minnesota Workmen's Compensation statutes. The present plaintiff notified the present defendant of the commencement of the action and tendered the defense of the action to the defendant, stating that the plaintiff would look to the defendant for indemnity of attorneys' fees if defendant declined the defense of the suit. The defendant refused to defend the action. Both Mr. Kruezkemper and the Whirlpool Corporation were represented by competent and able counsel. The counsel for Whirlpool found it necessary to spend some four hundred hours in preparation of the defense as "the trail was cold." Counsel's diligence uncovered some rather damaging evidence as to liability on Whirlpool's part (which evidence Mr. Kruezkemper's counsel never became aware of) but also came up with some good evidence with which to combat Mr. Kruezkemper's claim for $225,000. Though Mr. Kruezkemper's counsel had demanded $150,000 to settle the case, Whirlpool's local counsel was able to effectuate a settlement for $40,000. The Whirlpool Corporation then brought this action against the Morse Tuckpointing Co., alleging that the latter should indemnify the former for the $40,000 and the counsel fees and other expense which it had expended as a result of Mr. Kruezkemper's suit.

## XI.

The 2 x 4's which were attached to the plaintiff's corrugated tin roof were approximately ten years old and were quite rotten on the inside, which was the reason that one of them broke on April 10, 1957, when Mr. Kruezkemper stepped on it. The age and condition of the 2 x 4's was not apparent to cursory examination as they had been painted over twice, the second time having been in 1956. The man who was in charge of the defendant's employees on that day testified that

he had inspected the roof and the 2 x 4's for danger on numerous occasions in 1956 and the spring of 1957. He weighed 215 pounds ("heavier than the other boys") and he tested the boards by walking on them—while holding onto a fall line—as well as looking at them. He did not examine them "closely." Mr. Kruezkemper felt confident in walking on the 2 x 4's at the time of the accident for he had traversed the ill-fated 2 x 4 on three or four previous occasions that same day without any trouble.

## XII.

The State Industrial Commission had issued at the time of this accident a Construction Safety Code which did not have the force and effect of law. This Code provides that for Painters' or Tuck-pointers' Scaffolds safety lines shall be provided "between each pair of hangers or falls." Section 56. Falls are the ropes on each end of the swing or scaffold that provide support from the roof for the swing or scaffold. Section 62 provides that:

> "Roofers working on steep-pitched roofs shall be furnished with a safety belt and have a ¾ inch number one grade untreated manila rope for a life line securely fastened to building and safety belt."

The foregoing provisions are applicable to employers. The last sentence of M.S.A. § 182.12 provides:

> "Persons employed upon swinging scaffolds shall use a life line securely fastened to their persons and to some support other than the swinging scaffold."

Mr. Kruezkemper testified that he was, at the time of the accident, aware of the Construction Safety Code and that he knew about the requirement of life lines. Safety or life lines were not in use on Building No. 17 on April 10, 1957.

## XIII.

The defendant Morse Tuckpointing Co. had the requisite safety equipment in its possession and available for use by its employees. The latter seem to have been generally indifferent to life lines and safety belts. The man who was working alongside Mr. Kruezkemper on the scaffold moments before the accident testified that he would not want to use a safety line and that he felt no need to use one. Mr. Kruezkemper testified that he could have used a life line in walking along the roof from the scaffold to the window, but at the specific time of the accident he probably would not have used a life line if it had been there, in view of the fact that he had walked along the 2 x 4's previously on that day.

## XIV.

A plant engineer at the plaintiff's St. Paul plant had specific knowledge that the 2 x 4's in question were rotten. When the plaintiff had the roofs (and consequently the 2 x 4's) of its Building No. 17 painted in 1956, the foreman for the painting contractor told the plaintiff's plant engineer that the 2 x 4's on the conveyor roof "were rotten and should be replaced." The plant engineer notified his supervisor in the maintenance department of this condition, but nothing was done about it.

## XV.

The failure of the plaintiff Whirlpool Corporation to use reasonable care to maintain its premises in a safe condition was a proximate cause of the injury to Mr. Kruezkemper.

## XVI.

The failure of the defendant to assure that safety lines and other safety equipment were taken from its warehouse to Building No. 17 and installed and continually used by Mr. Kruezkemper and his fellow employees on April 10, 1957, if a breach of the contract between the plaintiff and defendant, was not a proximate cause of the injury to Mr. Kruezkemper on that date.

## XVII.

The knowing failure of Mr. Kruez-kemper to comply with the last sen-

tence of M.S.A. § 182.12 was a proximate cause of the injuries he sustained on April 10, 1957.

## CONCLUSIONS OF LAW

### I.

Negligence on the part of the plaintiff in failing to correct a dangerous condition of which its employees had specific knowledge was the primary and proximate cause of the injury to Mr. Kruezkemper on April 10, 1957.

### II.

The failure of the defendant to ensure that a life line was in use on Building No. 17 on April 10, 1957, if a breach of the contract between the parties, was not a proximate cause of the injuries to Mr. Kruezkemper and does not confer a contractual right of indemnity on the plaintiff.

### III.

The defendant did not breach its contract insofar as "complete insurance coverage" is concerned nor with regard to the replacement of the rotten 2 x 4's on the plaintiff's roof.

### IV.

The failure of Mr. Kruezkemper to avail himself of the safety equipment which was provided at the warehouse for his use by the defendant was a proximate cause of his injuries on April 10, 1957.

### V.

The defendant is entitled to judgment against the plaintiff ordering that the plaintiff is not entitled to indemnity or contribution against the defendant for sums expended for settlement and attorneys' fees and other expense in the action against the plaintiff by Mr. Kruezkemper.

Let judgment for defendants be entered accordingly.

## MEMORANDUM

This is an action for indemnity or contribution, but the latter theory has not been pressed as forcefully as the former. The definitive decision on indemnity in Minnesota is Hendrickson v. Minnesota Power & Light, 258 Minn. 368, 104 N.W. 2d 843 (1960), which describes the various situations in which one party may recover indemnity from another. Without exploring in detail all of the five categories described in that decision, it might generally be said that one of the more traditional situations for indemnity is one in which the party seeking indemnity was not "actively" negligent, but incurred liability because of failure to discover or prevent the misconduct of the one from whom indemnity is sought. See e. g., Lawrence v. Great Northern Ry., 109 F.Supp. 552, 555 (D.Minn.1952), aff'd Waylander-Peterson Co. v. Great Northern Ry., 201 F.2d 408 (8th Cir. 1953). In the latter case an employee of the railroad company, while walking along the railroad track, was injured by a piece of timber which was negligently allowed to fall from construction work on a bridge which passed over the track. The employee sued his employer for breach of a non-delegable duty to provide him with a safe place to work. The employer cross-claimed against the contractor whose negligence caused the timber to fall upon the employee. In sustaining the railroad's right of indemnity, Judge Nordbye said, 109 F.Supp. at 555:

> "[W]here the parties are not *in pari delicto* and the injury results from the acts of one whose negligence is the primary, dominant cause of the injury, and if such negligence exposes another to liability, the former is liable to the latter in the full amount of the damages incurred by such act. The teachings of Minneapolis Mill Co. v. Wheeler, 31 Minn. 121, 16 N.W. 698, and Fidelity & Casualty Co. v. Northwestern Telephone Exchange Co., 140 Minn. 229, 167 N.W. 800, fully sustain this view. Here, these parties were not *in pari delicto*. The railway company had no control over the construction of this bridge or of the workmen who were employed thereon. The railway company was required to operate its trains under the bridge and to direct

its trainmen to perform their duties in and about the bridge. The repeated instances of timbers and debris falling from the bridge, which rendered the railway company liable under the Federal Employers' Liability Act, was a condition which the railway company did not create. Its liability arose because of the nondelegable duty which rested upon it to exercise reasonable care to furnish Lawrence a safe place to work. Any negligence attributed to it so as to render it liable to Lawrence arose by the wrongdoing of those in charge of the construction of this bridge. The primary duty rested upon Waylander-Peterson Company to perform its work on the bridge so as not to endanger the workmen who were required to work in proximity thereto. Its neglect was the primary, active cause of Lawrence's injuries. The railroad company's negligence, as between the parties, was secondary and passive."

The Lawrence case is mentioned merely to put the instant case in its proper context. Here the plaintiff admits what it describes as "concurrent" negligence, which, of course, takes the case out of the purview of Lawrence v. Great Northern Ry., supra, and the Minnesota cases cited therein. The plaintiff relies solely on the contract between it and the defendant, and the duties and obligations which it wishes this Court to imply into that contract.

█ There was some argument at the trial whether the defendant's proposal or the plaintiff's purchase order constituted the written agreement between the parties. The Court has found that the defendant's warranty to do the work in a neat and workmanlike manner was part of their agreement.

█ The plaintiff's chief argument is that the defendant owed a contractual duty to the plaintiff to ensure that life lines were in use on Building No. 17 on April 10, 1957. The plaintiff urges that this duty arises principally from the terminology in the purchase order, which stipulated that the defendant would comply with "all applicable state, federal and local laws and executive orders and regulations issued pursuant thereto." The plaintiff argues that the Construction Safety Code which was promulgated by the Minnesota Industrial Commission had the force and effect of law. The plaintiff relies on M.S.A. § 15.042, subd. 1, which provides:

"Subdivision 1. For the purpose of carrying out the duties and powers imposed upon and granted to administrative agencies, each agency may promulgate reasonable rules and regulations and may amend, modify, or annul the same, and may prescribe methods and procedure in connection therewith. They shall prescribe reasonable notice, a fair hearing, findings of fact based upon substantial evidence, and shall not exceed the powers vested by statute."

Subdivision 3 goes on to provide that every rule which is properly filed shall have the force and effect of law. The defendant argues that subdivision 1 of M.S.A. 15.042 merely gives the Commission the power to promulgate regulations to enforce the powers given it by statute. In other words, the Commission's authority is limited to *enforcing* laws and does not extend to *making* laws or otherwise exercising a general regulatory authority. The defendant's argument seems the better one, for subdivision 1 of M.S.A. § 15.042 seems to contemplate merely the making of rules by the Commission to govern its proceedings. M.S.A. § 175.17, which deals with the powers and duties of the Industrial Commission does not seem to enlarge this rule-making power. The pertinent subsections of that section are as follows:

"(1) To exercise such powers and perform such duties concerning the administration of the workmen's compensation laws of the state as may be conferred and imposed on it by such laws;

"(2) To exercise all powers and perform all duties now conferred and

imposed on the department of labor and industry as heretofore constituted, and the bureaus of such department, so far as consistent with the provisions of this chapter;

"(3) To adopt reasonable and proper rules and regulations relative to the exercise of its powers and duties, and proper rules to govern its proceedings and to regulate the mode and manner of all investigations and hearings, which shall not be effective until ten days after their adoption, and a copy of these rules and regulations shall be delivered to every citizen making application therefor;"

In short, the Commission seems to have only the powers (1) which have been otherwise conferred upon it by statute and (2) to make rules which are necessary for the exercise of the above powers and for the regulation of its investigations and hearings.

■ It would thus seem that the Construction Safety Code cannot be incorporated into the parties' contract. It is possible that M.S.A. § 132.12 is part of the contract. The last sentence of this section provides:

"Persons employed upon swinging scaffolds shall use a life line securely fastened to their persons and to some support other than the swinging scaffold."

As will be pointed out later, there is some doubt that this section is applicable here, but it can be assumed to be part of the contract. Reading the contract even more broadly, a further contractual duty can be founded upon the warranty to do a neat and workmanlike job. It is arguable that this terminology imposes a duty to use due care, Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co., 350 U.S. 124, 133, 76 S.Ct. 232, 100 L.Ed. 133 (1955), and that this agreement implies an obligation to indemnify for damages resulting from a breach of this duty. Hendrickson v. Minnesota Power & Light Co., 258 Minn. 368, 104 N.W.2d 843, 849 (1960). The Minnesota Court in the latter case, however, left open the question presented here, which is "[w]hether or not an express agreement to use due care necessarily implies an undertaking to indemnify for all damages resulting in whole or in part from a breach of that duty * * *." 104 N.W.2d at 849 (emphasis supplied). The cases suggest that the above question will ultimately be answered in the negative by the Minnesota Court. Before the cases are examined in detail, the facts of this case should be reviewed to ascertain the relationship of the respective duties of the parties.

■■ There is little doubt (as the plaintiff has admitted) that the plaintiff breached its duty toward defendant's employee Kruezkemper with regard to the 2 x 4's that were attached to the roof of the conveyor housing alongside plaintiff's Building No. 17. There is perhaps some doubt (which need not be resolved in this case) as to just how this duty should be phrased. In the leading case of Nash v. Minneapolis Mill Co., 24 Minn. 501 (1878), it was said:

"* * * [T]he owner or occupant [of land] is bound to use ordinary care and diligence to keep the premises in a safe condition for the access of persons who come thereon by his invitation, express or implied, for the transaction of business, or for any other purpose beneficial to him."

In that case the plaintiff had been injured by falling through a platform which had negligently been allowed to become rotten. Likewise, in Marsh v. Minneapolis Brewing Co., 92 Minn. 182, 99 N.W. 630 (1904), the court followed the above rule to sustain a recovery by a plaintiff who had been injured in falling through a rotten wooden sidewalk which the defendant had constructed upon his premises and held out to the public as a thoroughfare. The previously quoted rule was applied continually in landowner liability cases in Minnesota, see 13B Dunnell's Digest 78 at fn. 12, until the Restatement of Torts rephrased the rule, couching it in terms of a duty of reasonable care only to business invitees (who

are people who come upon the land of another for a purpose directly or indirectly connected with business dealings between them). See Restatement of Torts § 332. Dean Prosser has written a very persuasive commentary in which he argues that the implications and phraseology of the older statement of the rule are more correct from a standpoint of history (and perhaps common sense as well). Prosser, Business Visitors and Invitees, 26 Minn.L.Rev. 573 (1942). The Supreme Court of Minnesota seems to have expressly rejected at least one of Dean Prosser's arguments, Dishington v. A. W. Kuettel & Sons, Inc., 255 Minn. 325, 96 N.W.2d 684, 689, at fn. 7 (1959), without saying whether it disagreed with the numerous cases from Minnesota and elsewhere upon which that scholar's contentions were based. But no matter which definition of the rule is applied, it seems clear that the plaintiff Whirlpool Corporation owed a duty to Kruezkemper to make safe dangerous conditions of which it knew. It is clear that "a workman who comes to make alterations or repairs on the land" is a business invitee. Restatement of Torts § 332, Comment a, at p. 898. See also Lundeen v. Great Northern Ry., 141 Minn. 180, 169 N.W. 702 (1918); Resnikoff v. Friedman, 124 Minn. 343, 144 N.W. 1095 (1914) (roofing contractor who fell when a 2 x 4 broke, held to be an invitee as he was there for the purpose of performing his contract with the owner). It also seems clear (as one of the plaintiff's expert witnesses testified) that the 2 x 4's were cleated onto the roof for the purpose of providing safe footing and that persons upon the roof would be expected to walk upon the 2 x 4's. Compare Dore v. Swift & Co., 175 Minn. 545, 221 N.W. 904 (1928). Indeed, persons would not be likely to walk unaided upon a pitched roof when the owner had provided a means of safer passage. Further, the duty of the landowner is not delegable to independent contractors, Corrigan v. Elsinger, 81 Minn. 42, 83 N.W. 492 (1900), and extends to conditions of which he knew or should—in the exercise of reasonable care—have known. However, this is not a case in which it is necessary to decide whether the plaintiff here should have inspected these 2 x 4's to see if they were rotten; this is a case in which a supervisor in the plaintiff's plant maintenance department was told that 2 x 4's upon the conveyor housing roof *which had just been freshly painted* were rotten.

The facts of the case leave some doubt that, even if the defendant had taken great pains to see that his employees had taken life lines to Building No. 17 and properly installed them, this accident would have been prevented. The plaintiff had painted over rotten 2 x 4's on its roof, and there seems to be no doubt that this was the primary cause of Kruezkemper's injuries. Even if the life lines had been installed on the building, early in the morning of April 10, 1957, there is considerable doubt that Kruezkemper would have been using a life line at the time of the accident. It is far from clear that this requirement of life lines was intended to apply to situations in which the employees were traveling considerable distances away from the swinging scaffold. The statute seems designed to protect the worker if the swinging scaffold should fall. But assuming the safety or life line had been there, Kruezkemper's testimony was to the effect that he had been lulled into a feeling of safety after traversing the 2 x 4's three or four times on the morning of the accident and that he probably would not have used a safety line even if one had been there. Viewing the case in this light, the defendant's breach of contractual duty, if any, can not be said to have been the proximate cause of Kruezkemper's injuries. It is clear that the accident would not have happened but for the rotten 2 x 4's having been painted over and left upon the roof. It is not clear that a safety line hanging between the fall lines would have prevented the accident. And finally, and most important, it is not clear that the contract relied upon is sufficient to sustain the plaintiff's claim to indemnity under any reasonable view of this case.

654

It would seem that the most accurate view of this case is as one in which the plaintiff's breach of duty was the proximate cause of the accident. It cannot be said with reasonable certainty that if the defendant's employees had installed the lifelines on Building No. 17 on April 10, 1957, that Kruezkemper would have used it to traverse the 2 x 4's for the fourth or fifth time. The case in this posture is one in which the plaintiff is seeking to interpret this contract to mean that a company whose fault did not contribute to the accident should indemnify one whose fault was the sole cause of the accident. It is not only somewhat difficult to think that one who promised to obey applicable laws and do a neat and workmanlike job intended such a result to flow from those words, but—and more important—the case law suggests that these words cannot be stretched that far. Even where the parties have had an express contract of indemnity, the courts have not construed it to be applicable where the accident was proximately caused by the sole negligence of the indemnitee (which is probably the situation here). See Mustas v. Inland Construction Co., 19 Wis.2d 194, 120 N.W.2d 95, 102 (1963); Pittsburg Steel Co. v. Patterson-Emerson-Comstock, Inc., 404 Pa. 53, 171 A.2d 185 (1961); Michigan Mutual Insurance Co. v. Royal Indemnity Co., 313 F.2d 467 (6th Cir. 1963); 27 Am.Jur. Indemnity § 15; 175 A.L.R. at 32. But here there was no contract of indemnity, only a promise to obey applicable laws and an implied warranty of performance in a non-negligent manner. The plaintiff here could have insisted upon a contract which would have held it harmless even in the event of its own negligence. See Northern Pac. Ry. v. Thornton Bros. Co., 206 Minn. 193, 288 N.W. 226, 227 (1939), and cases there cited. Such contracts do not contravene public policy, Speltz Grain & Coal Co. v. Rush, 236 Minn. 1, 51 N.W.2d 641, 644 (1952), and do not involve the courts in deliberations as to proximate cause. Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. Co., 199 F.2d 725 (8th Cir.

1952). If the plaintiff did not insert a provision for indemnity under all circumstances it is difficult to see how this Court can insert such a provision and change the agreement of the parties at this late date. See Mayer v. Fairlawn Jewish Center, 38 N.J. 549, 186 A.2d 274, 280–281 (1962); American Mut. Liab. Ins. Co. v. Matthews, 182 F.2d 322 (2d Cir. 1950). In the latter case a stevedore's employee was injured by the sole negligence of the shipowner and the Court rejected the shipowner's plea to imply a promise of indemnity, saying, 182 F.2d at 324:

> "To imply such a promise would mean that the employer agreed to protect the shipowner against liability arising out of the shipowner's own negligence. In the absence of an express promise, such an implication would be utterly unreasonable. Hence we can find no contractual basis for indemnity * * *."

This case and the Mayer case, which will be discussed in more detail later, suggest that the Minnesota Court would not invoke an implied warranty to indemnify the owner from the results of its own negligence.

On the other hand, if this case is viewed as one in which the lack of a life line contributed to the injury of Kruezkemper on April 10, 1957, the plaintiff's case is no stronger and is perhaps considerably weaker. Even where the parties have had an express contract of indemnity, some courts have been reluctant to hold it applicable where the indemnitor and indemnitee were concurrently negligent. See 175 A.L.R. at 34. More important is the fact that if the absence of a life line contributed to Kruezkemper's injuries, then Kruezkemper was as much at fault as his employer. His employer testified that life lines and safety belts were available in his warehouse for use by his employees. The latter seemed generally indifferent to this sort of safety equipment. M.S.A. § 182.12, quoted supra, requires the use of life lines in the general situation pre-

sented here. This statute is certainly as applicable to employees as employers, and Kruezkemper was aware of these safety requirements at the time of the accident, if that makes any difference. This statute was designed to protect Kruezkemper, and he knowingly violated it. Under this view of the case, Kruezkemper would appear to be contributorily negligent as a matter of law.

There is no need, however, to continue to recast the facts and needlessly prolong this memorandum. It is enough to say that the theory of the plaintiff's present action, a right of contractual indemnity, is fraught with doubt which, considering that the plaintiff has the burden of persuasion, requires the judgment to be for the defendant. The reason, as far as the *express* contract is concerned, is found in the law of contracts and not in the common law doctrines of indemnity and contribution. See Anthony v. Louisiana & Ark. Ry., 316 F.2d 858 (8th Cir. 1963). It is difficult, if not impossible, to believe that the parties intended that the defendant should indemnify the plaintiff where the latter's fault was certain and the former's only uncertain at best.

The plaintiff, however, argues that this Court should *imply* an agreement by the defendant to indemnify the plaintiff, citing Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1955). In that case a stevedoring company's employees in South Carolina improperly stowed large rolls of pulp on a vessel. The shipowner had the right to inspect the cargo stowage and reject it, but was negligent (the jury said) in the performance of this duty of inspection. When the ship reached New York it was unloaded by employees of the same stevedoring company, one of whom was severely injured when struck by one of the large rolls which broke loose. The employee sued the shipowner, who cross-claimed against the stevedore for indemnity. The jury gave the employee a verdict for $75,000, but the trial judge concluded that the shipowner and the stevedore were joint-feasors and therefore declined to order the stevedore to reimburse the shipowner. D.C., 111 F.Supp. 505. The Court of Appeals disagreed with the District Court, saying, 2 Cir., 211 F.2d 277, 279:

> "We think the improper stowage the primary and active cause of the accident. Under our holdings in Lo Bue v. United States, 2 Cir., 188 F.2d 800, and Rich v. United States, 2 Cir., 177 F.2d 688, indemnity over is recoverable where, as here, the employer's negligence was the 'sole' 'active' or 'primary' cause of the accident. Nor does the absence of a formal contract bar indemnity. McFall v. Compagnie Maritime Belge (Lloyd Royal) S.A., 304 N.Y. 314, 107 N.E.2d 463; Rich v. United States, 2 Cir., 177 F.2d 688. Ryan was obligated by implied contract to perform the work in a reasonably safe manner. This duty Ryan breached; accordingly, Pan-Atlantic is entitled to indemnity."

Taking the case to resolve conflicting views on Federal questions not relevant here, the Supreme Court affirmed the decision of the Court of Appeals, phrasing the theory of recovery solely in terms of breach of an implied warranty of workmanlike service. (This slight change in terminology, which has perhaps caused some difficulty in this case, will be shown to have no different legal effect than the terminology employed by the Court of Appeals.)

There is no quarrel with Ryan here; the facts of this case are simply considerably different from those in that case. That case turned on the rationale that the negligence of the employer (the indemnitor) "was the 'sole' 'active' or 'primary' cause of the accident." 211 F.2d at 279. That is not true here. Here the negligence of the party seeking indemnity was the "primary" cause of this accident and perhaps the "sole" cause. No case in the State courts has been found involving a recovery on this implied "warranty of workmanlike service" (350 U.S. at 133, 76 S.Ct. at 237, 100 L.Ed. 133) by an

indemnitee guilty of the sort of negligence presented here. In Burris v. American Chicle Co., 120 F.2d 218 (2d Cir. 1941), a workman received bodily injuries when he fell from a swinging scaffold, the fall lines of which had not been properly inspected. The workman sued the owner of the building, who in turn cross-claimed for indemnity against the workman's employer, the window cleaning company. The building owner was held liable under a statute which in effect made non-delegable the duty of inspection of the scaffolding equipment. Indemnity against the window-cleaning contractor was sustained, the court noting, "*Without any active participation in the wrongful acts or omissions* of [the contractor], [the owner] has become responsible to the plaintiff for the consequences of [the contractor's] own wrong and has the right to be indemnified by the wrongdoer. * * * That [the owner's] duty to comply with the statute could not be delegated so as to relieve it from liability to the plaintiff does not make [the owner], and [the contractor] joint tort feasors or free [the contractor] from liability as indemnitor." (Emphasis supplied.) In San Francisco Unified School Dist. v. California Bldg. Maintenance Co., 162 Cal.App.2d 434, 328 P.2d 785 (1958), a window-washer was injured by reason of the failure of his employer to comply with relevant safety regulations and the express contract between the parties as to how the window-washing would be performed. The window-washer sued the owner for failing to provide him a safe place to work, and the owner sued the contractor for indemnity because of the latter's breach of contract. The trial court granted a non-suit in favor of the contractor, but the District Court of Appeal reversed, *saying that it was question of fact whether the owner should be precluded from recovery because of its conduct,* i. e., whether the conduct of the owner helped to bring about the injury to the window-washer. In Whitmarsh v. Durastone Co., 122 F.Supp. 806 (D.R.I. 1954), the estate of a deceased workman had sued the owner of the premises upon which he was killed. Upon settlement of the suit, the owner sought indemnity from the general contractor, who in turn cross-claimed against the subcontractor whose alleged negligence caused the accident. The general contractor alleged, inter alia, that it had no right of control over the methods used by the subcontractor. The latter's motion to dismiss the cross-claim was denied.

In none of the previous cases was the negligence of the person seeking indemnity the primary or active cause of the injury for which it had responded in damages. Most if not all of those cases involved an indemnitee who had been held constructively liable for breach of a non-delegable duty. The indemnitee then proceeded against the party who had actually caused the accident or who had a contractual duty of care which had been breached. See also Seaboard Air Line Ry. Co. v. American Dist. Elec. Protective Co., 106 Fla. 330, 143 So. 316 (1932); American Dist. Tel. Co. v. Kittleson, 179 F.2d 946 (8th Cir. 1950); United States Fidelity & Guar. Co. v. Virginia Engineering Co., 213 F.2d 109 (4th Cir. 1954); Brown Hotel Co. v. Pittsburgh Fuel Co., 311 Ky. 396, 224 S.W.2d 165 (1949). The implied premise of unequal fault in these cases is illustrated by Otis Elevator Co. v. Maryland Casualty Co., 95 Colo. 99, 33 P.2d 974 (1934), a case in which an elevator company was held liable to indemnify the building owner who had paid damages to persons injured by reason of the former's breach of contractual duty to properly inspect and maintain the elevator. In shifting the burden from the shoulders of the owner, the Court said, "It is not shown that any act of the [owner] or its employees, not under the direction and control of [the elevator] company, in any way contributed to the accident." An opinion which contains an excellent discussion of this area of the law is McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co., 323 S.W.2d 788 (Mo.S.Ct.1959). In that case the building interior was to be painted by a contractor, the owner having

first pointed out all of the dangerous electrical conduits in the building and secured an agreement that the contractor would instruct its employees as to the existence and location of such hazards. The contractor failed to so instruct one of his employees, who was killed. The owner, who responded in damages to the deceased's estate, was held entitled to indemnity from the contractor for breach of the latter's contract. As the Missouri Court pointed out in the latter case, there are a number of theories under which the courts have allowed indemnity. "All of these tests seem to be attempts to apply equitable principles and none of them satisfactorily explains all cases." 323 S.W.2d at 793. The general equitable nature of the theory of indemnity is commented on in Prosser on Torts 249–251 (2d ed. 1955), where the author concludes:

> "Probably, as is so often the case in the law of torts, no one explanation can be found which will cover all of the cases; and the duty to indemnify, like so many other duties, arises where community opinion would consider that in justice the responsibility should rest upon one tort feasor rather than another."

It has naturally followed from this equitable premise that indemnity should not be allowed where the parties were in equal fault or where—speaking broadly—there was no good reason to wholly shift the loss from one to another.

One of the leading cases as to when indemnity is *not* allowed is Builders' Supply Co. v. McCabe, 366 Pa. 322, 77 A.2d 368, 24 A.L.R.2d 319 (1951), cited with approval by the Minnesota Court in the Hendrickson case, 104 N.W.2d 847 at fn. 11, and many other recent decisions as well. See e. g., Busy Bee Buffet v. Ferrell, 82 Ariz. 192, 310 P.2d 817 (1957); Cahill Bros., Inc. v. Clementina Co., 208 Cal.App.2d 367, 25 Cal.Rptr. 301 (1962), invitee injured because of failure of both the general and the subcontractor to provide adequate safeguards; held that if the person seeking indemnity has knowledge of the negligence he is deprived of

the right of implied contractual indemnity; State ex rel. Siegel v. McLaughlin, 315 S.W.2d 499, 507 (Mo.1958); Mayer v. Fairlawn Jewish Center, 38 N.J. 549, 186 A.2d 274 (1962), Jacobs v. General Acc. Fire & Life Assur. Corp., 14 Wis.2d 1, 109 N.W.2d 462, 88 A.L.R.2d 1347 (1961). See also Miller v. Pennsylvania R. R., 236 F.2d 295 (2d Cir. 1956); Detroit G. H. & M. Ry. v. Boomer, 194 Mich. 52, 160 N.W. 542 (1916); Restatement, Restitution § 98.

The Cahill Bros. case supra is fairly close to the facts of this case, but the Mayer case is even more persuasive. In the Mayer case an invitee in the owner's building desired to go outside to "get a breath of air." He was instructed by one of the owner's employees to go out an unlocked door which had an "exit" sign above it. It was dark outside. He took a couple of steps and fell into an unguarded stairwell under construction by a contractor. He sustained substantial injuries and sued the owner, who cross-claimed against the contractor for indemnity. The owner relied on the following provision in its contract:

> "PROTECTION OF WORK, PROPERTY AND PERSONS—
>
> "The contractor shall adequately protect the work, adjacent property and the public and shall be responsible for *any* damage or injury due to his act or neglect." (Emphasis supplied.)

It is to be observed that the contract in the Mayer case gives much more protection to the owner of the premises than does the contract in this case. The contractor there promises to indemnify the owner for *any* damage due to his act or neglect; the contractor here has only promised to obey applicable laws and do a workmanlike job. The trial court entered judgment against the owner on its claim for indemnity and the intermediate appellate court in New Jersey affirmed this decision. 71 N.J.Super. 313, 177 A.2d 40 (1961). The New Jersey Supreme Court reversed and remanded the case for further findings of fact. After

an extensive review of the case law, the Court spelled out the situation in which the owner could not recover on the previously mentioned contract, using reasoning which this Court feels is also applicable here. At 186 A.2d at 280–281, it was said:

"If, * * *, the invitor (contractee) is himself guilty of separate and independent active negligence which concurs with that of the contractor in producing the invitee's injury, there can be no recovery *inter se* on the 'protection of work' clause in the contract. The reason is obvious. The theme of the contract is that the contractor will not perform the construction work in such negligent fashion as to create dangerous conditions on the premises and thereby expose third persons to harm. Protection of such persons against independent negligent acts of commission of the contractee must be considered beyond the scope of that undertaking in the absence of language clearly establishing such a broad obligation."

This language as well as the ensuing discussion in Mayer makes it clear that where an owner wishes to be indemnified by a contractor in a situation where the owner has been guilty of something *more* than a mere failure to inspect, detect, and correct the unsafe condition, then the owner must say so in fairly plain language in the contract. This is what the parties did in the cases cited in the Hendrickson case at footnote 20, 104 N.W.2d at 848. See e. g., Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R., 199 F.2d 725 (8th Cir. 1952). The reason is—as the Mayer case makes clear—that even an *express* contract indemnifying for "any" damage caused by the fault of the contractor cannot be stretched to include the fault of the owner and the *implied* contractual remedy "bears a substantial resemblance to the principles underlying implied indemnity and restitution." 186 A.2d at 281. In the latter situation the courts have only allowed

indemnity where the indemnitee was held originally liable solely because of the imposition of a constructive or secondary liability. See Builders Supply Co. v. McCabe, supra, 77 A.2d at 371. In the stevedoring accident cases the shipowner has been compelled to couch his indemnity action against the stevedoring contractor in terms of a breach of an implied warranty because of conceptual difficulties arising out of the Harbor Workers' Compensation Act, see Brown v. American Hawaiian S.S. Co., 211 F.2d 16, 18 (3rd Cir. 1954) (text accompanying fn. 5), but that has not changed the results of those cases. Compare United States v. Arrow Stevedoring Co., 175 F.2d 329 (9th Cir. 1949) (negligence of stevedore "sole proximate cause" of accident; shipowner allowed indemnity) with Hawn v. Pope & Talbott, Inc., 198 F.2d 800, 807 (3rd Cir. 1952) (shipowner and stevedore concurrently negligent; shipowner denied indemnity on implied contract) and American Mut. Liab. Ins. Co. v. Matthews, 182 F.2d 322 (2d Cir. 1950) (shipowner solely negligent; stevedore not liable for indemnity).

In those same stevedoring accident cases the Supreme Court has frowned upon the application of theories of active or passive and primary or secondary negligence to cases of contractual indemnity. Weyerhaeuser S.S. Co. v. Nacirema Co., 355 U.S. 563, 569, 78 S.Ct. 438, 2 L.Ed. 2d 491 (1957). The Weyerhaeuser case indicates that the Supreme Court in Ryan perhaps made a change in the phraseology of the law of maritime indemnity. In stevedore accident cases prior to Ryan some of the lower Federal courts had been looking at the conduct of stevedoring contractors in comparison to shipowners and had in some cases been categorizing the conduct of the former as active or primary negligence and the conduct of the latter as secondary or passive negligence. Once this characterization was made, the shipowner was held to be entitled to indemnity from the stevedoring contractor. See e. g. Rich v. United States, 177 F.2d 688, 691 (2d Cir., 1949). As previously

indicated, the State courts have not settled on any one or more clear theoretical bases for indemnity. Their use of the terms active, passive, primary, and secondary, etc., represent attempts to rationalize their reasons for totally shifting the burden of a loss from one party to another. The terminology may be somewhat mechanical, and the characterization difficult, but this has not deterred the State courts from its use. The Supreme Court of the United States, on the other hand, decided to reject the use of this terminology in stevedore accident cases. The Court perhaps did not think the results justified the problems inherent in the characterization process. The Court certainly did not think that the shipowner would be entitled to indemnity from the stevedore in *all* circumstances. The problem in Weyerhaeuser was that the trial judge had precluded the shipowner from seeking indemnity from the stevedore simply because the former had been held liable to the injured employee for breach of a non-delegable duty. The Court made it very clear that the shipowner was only entitled to indemnity "absent conduct on its part sufficient to preclude recovery," which was a matter "for jury consideration under appropriate instructions." 355 U.S. at 567, 78 S.Ct. at 440, 2 L.Ed.2d 491. In other words, the Supreme Court has not held that the person seeking indemnity on an implied contract is entitled to it in *all* circumstances. That Court's language and citation of cases in Weyerhaeuser makes clear its feeling that there will be some situations in which the indemnitee will have played some part in the accident which will bar its indemnification. See 355 U.S. at 568, 78 S.Ct. at 441, 2 L.Ed.2d 491. But whatever the Supreme Court's feelings on the law of contractual indemnity (or its phrasing) in maritime cases, this Court must look to the Minnesota decisions for guidance in the matter at hand. In the event that there are no decisions on the point in Minnesota or where, as here, the question has expressly been left open, then this Court feels that it should look to other State decisions which Minnesota would follow. Right or wrong, all of the State decisions have talked of primary or active negligence, see e. g., Lawrence v. Great Northern Ry., D.C., 109 F.Supp. 552, supra (explaining Minnesota law); Jacobs v. General Acc. Fire & Life Assur. Corp., 14 Wis.2d 1, 109 N.W. 462, 467, 88 A.L.R.2d 1347 (1961), and—right or wrong—have never allowed indemnity where the person seeking indemnity was the "primary" or "active" wrongdoer. In this case the plaintiff kept wooden boards used for walking on its roof for ten years, painted them twice, and finally allowed them to remain there after being told of their rotten condition. This Court—in its dual role as a trier of fact—feels that this was "active" negligence which was the "primary" cause of the accident. The Minnesota Court has noted the use of this terminology with apparent approval, Larson v. City of Minneapolis, 262 Minn. 142, 114 N.W.2d 68, 73 at fn. 3 (1962), but even if this terminology is abandoned and the plaintiff's fault simply described as "concurrent," the plaintiff's case is no stronger. See Hendrickson v. Minnesota Power & Light Co., 258 Minn. 368, 104 N.W.2d 843, 849 (1960) (text accompanying fn. 11); Builders' Supply Co. v. McCabe, supra; Cahill Bros., Inc. v. Clementina Co., supra. In any event, in view of the unanimous case law and the uncertainty presented by the Hendrickson case, see 104 N.W.2d at 849, this Court is reluctant to hold that the defendant's express agreement to obey all applicable laws and its implied agreement to use due care further implied an undertaking to indemnify the plaintiff for *all* damages arising out of the performance of the contract.

Other less important issues require only brief mention. Plaintiff argues that the defendant was bound by virtue of its proposal to provide its men with a safe place to work and that it breached this duty to the plaintiff by not removing the plaintiff's own boards and replacing them with safe 2 x 4's. Assuming the defendant to be bound by its proposal in this,

regard, the evidence is not persuasive that the defendant should have replaced the 2 x 4's. Another contractor said that *he* would have replaced them, but the defendant's employees were not going to work on the conveyor housing roof—they were working on the scaffold. It is far from clear that the defendant had the duty—or the right—to rip up 2 x 4's on the plaintiff's roof and temporarily substitute its own. But even assuming that the defendant did have this duty, it is doubtful that the plaintiff can complain of the defendant not replacing the rotten—and freshly painted—boards of which it had specific knowledge. In Restatement, Restitution § 95 (1937) it is said:

> "Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, *unless after discovery of the danger, he acquiesced in the continuation of the condition."* [Emphasis supplied.]

The emphasized words suggest that the plaintiff's continued acquiescence in the condition of the boards makes it a joint participant in the tortious conduct of the defendant, if any, and bars it from indemnity. See Comment a, p. 417. It is one thing when one has relied on the warranties of another and has been held constructively liable to a third party because those warranties were breached. Boston Woven Hose & Rubber Co. v. Kendall, 178 Mass. 232, 59 N.E. 657, 51 L.R.A. 781 (1901). It is something else to complain that someone else did not correct a condition that was known of by the person seeking indemnity.

The plaintiff also urges that the defendant was obligated to insure the plaintiff against suits such as brought by Kruezkemper. The plaintiff bases this argument on the fact that the defendant's proposal said, inter alia, that "complete insurance coverage" would be provided. The defendant's president testified earlier (in the discovery process in Kruezkemper's suit) that the plaintiff's personnel requested that the defendant send them its certificates of insurance before it commenced the operation. This suggests that at the time the purchase order was issued the plaintiff was cognizant of the defendant's precise insurance coverage. An expert insurance agent testified that the defendant's insurance policies complied with the insurance conditions of the plaintiff's purchase order but not with the defendant's own proposal. In view of the testimony of the defendant's president, however, there is no need to decide whether the proposal's language regarding insurance was superseded by the purchase order's insurance provisions.

The plaintiff's pleadings in this case seek indemnity or contribution. The latter theory was not strongly pressed. Contribution arises out of a situation in which two tort-feasors had a common liability towards a third party and one tort-feasor paid more than his fair share. See Hendrickson v. Minnesota Power & Light Co., 258 Minn. 368, 104 N.W.2d 843 (1960). Justice Loevinger said in the latter case:

> " * * * [A] person who discharges a liability for a tort cannot recover contribution from a joint tortfeasor who is immune from action with respect to such tort because of some personal defense. The right does not exist in such circumstances because there is no common liability." 258 Minn. at 372.

The defendant here was insured under the Workmen's Compensation law and thus immune from suit in tort by Kruezkemper. The absence of a common liability between the plaintiff and the defendant compels the conclusion that the plaintiff does not have a right of contribution in this case.