---

(98 App. Div. 436)

## JOHNSON v. FARGO.

(Supreme Court, Appellate Division, Fourth Department. November 23, 1904.)

1. CONTRACTS—DEROGATION OF COMMON-LAW LIABILITY—STRICT CONSTRUCTION.

Contracts breaking down common-law liability and relieving persons from just penalties for their negligent or improper conduct are not to be favored, and should not be given an enforcement beyond that demanded by their strict construction.

2. MASTER AND SERVANT—INJURY TO SERVANT—CONTRACTS RELEASING LIABILITY—VALIDITY.

A contract made between employer and employé at the time of the employment of the latter, whereby he agreed to assume all risks of accident or injury which he would sustain in the course of his employment, whether occasioned by the negligence of the employer or any of its agents or employés, or otherwise, and further providing that in case he should at any time suffer injury he would at once execute and deliver

¶ 2. See Master and Servant, vol. 34, Cent. Dig. §§ 166, 168.

to the employer a release of all claims, demands, and causes of action arising out of or connected with such injury, is contrary to public policy and void.

Stover, J., dissenting.

Appeal from Onondaga County Court.

Action by Ray Johnson against James C. Fargo, as president of the American Express Company. From a judgment of the County Court affirming a judgment of the Municipal Court for plaintiff, and from an order affirming an order denying a motion for a new trial, defendant appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Willard A. Glen, for appellant.

F. A. Kuntzsch, for respondent.

HISCOCK, J. Plaintiff recovered his judgment in this action for damages resulting from a personal injury while in the employ of defendant.

In the transaction of its business the American Express Company, of which the defendant is the president, maintained in the city of Syracuse a barn wherein were kept wagons and sleighs, which while out of use were stored upon the second floor. There was a large elevator which was used for the purpose of carrying them up and down to and from this floor. This elevator was about 9 feet wide and 16 feet long. To the elevator floor, two upon each side, were attached four bails which were suspended from chains running above and around a drum, and by which with a system of ropes the elevator was raised and lowered. When the elevator was raised to the second floor it fitted into an open space therein, and was kept in place by six pieces of iron which were bolted to the elevator floor, three upon one side and three upon the other, termed "buttons" and turning upon bolts, and which when turned lengthwise with the elevator would enable it to drop down, and when turned at right angles with the elevator rested upon the floor of the barn, extending over the same 2½ or 3 inches, and holding the elevator in place.

Upon the day of the accident plaintiff, in accordance with his instructions, was engaged with other men in bringing down some sleighs from the second to the first floor of the barn. They unhooked the bails of the elevator on one side, as it was necessary to do in order to get the sleighs upon it. Before removing the bails the iron buttons were turned to the proper position by which to hold the elevator at the second floor. While the men were thus occupied the elevator gave way, and one side thereof tipped or dropped to the floor below like a table leaf, the other side hanging by the bails. The plaintiff was precipitated and the injuries were caused. It is claimed by him that the cause of this fall was that the wood of the elevator floor upon the top adjacent to and adjoining the buttons upon one side was rotten, as the result of which the buttons broke through the flooring beneath, and allowed the elevator to fall as above stated.

Upon the trial were contested the ordinary questions incident to a case of this kind. It was claimed by the defendant that the appliance

was not out of order; that, if it was, plaintiff ought to have known as much about it as the defendant, and that he assumed the risks incident thereto; that plaintiff and his co-employés were guilty of carelessness which was the producing cause of the accident.

A review of the evidence produced, in the light of the very careful and elaborate brief of appellant's counsel, leads to the conclusion that these were questions of fact upon which the jury had a right to find as they did, and that no error in ruling upon evidence was committed by the trial court which calls for a reversal of their verdict. This is the second time that the case has been tried, a former verdict having been set aside in Municipal Court, and we do not deem it profitable to grant another trial upon considerations involving the weight of evidence.

The interesting and important question upon this appeal arises in respect to the validity of a release taken by defendant from plaintiff when the latter was employed, whereby, in effect, the plaintiff waived any right of action for injuries resulting from the negligence of the defendant. While it is urged by respondent upon this appeal that said release was ineffective for lack of consideration and other reasons, I think, upon the evidence and under the charge in Municipal Court, plaintiff is compelled to sustain his judgment upon the ground that the release was void as a matter of public policy. This contract, by its recitals and by many of its provisions, is manifestly limited to accidents which might arise while plaintiff was acting in connection with the care and carriage and handling of merchandise and property in course of transportation. By a final clause, however, the plaintiff does agree that:

"In consideration of my employment by said American Express Company, that I will assume all risks of accident or injury which I shall meet with or sustain in the course of such employment, whether occasioned by the negligence of said company, or any of its members, officers, agents or employés. or otherwise; and that in case I shall at any time suffer any such injury, I will at once execute and deliver to said company, a good and sufficient release * * * of all claims, demands and causes of action arising out of such injury or connected therewith or resulting therefrom."

It is not seriously contended by the respondent that this clause does not apply to, and, if valid, is not sufficiently broad to cover, an accident such as is now complained of; and we are brought to the determination of the question whether the courts as a matter of public policy will refuse to give approval and enforcement to a contract by which, in addition, an employer seeks to relieve himself from any liability which otherwise might result from his negligent and careless acts towards his employés. The learned counsel for the appellant insists that we should not so refuse. He has, however, cited no cases which to my mind are commanding authorities in favor of, or even clear guides to, his proposition. The decisions most relied upon by him are in those known as the "Express Cases," and of which Baltimore & Ohio Railroad Co. v. Voight, 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560, as the leading one, may be briefly reviewed, and, as I believe, distinguished from the one at bar.

In consideration of certain special facilities extended to it by the railway company, the express company agreed to protect and hold harmless the former from all liability it might be under to employés of the express company for any injuries sustained by them while being

transported by the railroad company, whether the injuries were caused by the negligence of the latter or its servants, or otherwise. Voight, by his contract of employment with the express company, in turn agreed to assume the risk of all accident or injury, whether occasioned by negligence of the railroad company or otherwise, and did undertake and agree to indemnify the express company from any and all claims that might be made against it arising out of any claim or recovery for any damages sustained resulting from negligence. It was held that these agreements prevented a recovery against the railroad company for its negligence by the employé of the express company. It will thus be noted that the court had for consideration, not an agreement by which the employer sought to obtain immunity for its own negligence from its own employés, but the question whether an agreement of release made by an employer with a third party for the purpose of securing special facilities necessary to the transaction of its business might be made binding upon the former's employés so as to protect the third party. It seems at the outset that as a matter of public policy there is a distinct difference between allowing employers to make contracts exempting themselves from liability for their own acts, and permitting them, under the special exigencies and conditions fully recognized in the case under review as existing in the express business, to make contracts limiting the liability of a third party with whom they are compelled to deal. It would appear that the court hardly intended to discuss the question now presented to us. It commences its discussion by stating, as the question to be answered, whether the defendant in error might avoid the agreement that the railroad company should not be liable "by invoking that principle of public policy which has been held to forbid a common carrier of passengers for hire to contract against responsibility for negligence." And the opinion concludes with the statement "that Voight, occupying an express car as a messenger in charge of express matter, in pursuance of the contract between the companies, was not a passenger," and that the contract in question did not contravene public policy. The dissenting opinion makes it still more clear that the court was laboring with the question whether it was against public policy to allow a railroad company to relieve itself from the relation of common carrier to one who traveled upon its cars under a contract which secured to his employer, as a consideration for such relief, special accommodations.

Our attention is also called to a passage in the opinion in Dowd v. N. Y. O. & W. Ry. Co., 170 N. Y. 459, 63 N. E. 541, where, after a discussion of the subject of assumed risks, it is said:

"There is no rule of public policy which prevents an employé from deciding whether in view of increased wages the difficulties of obtaining employment, or other sufficient reasons, it may not be wise and prudent to accept employment subject to the rule of obvious risks."

It requires no extended discussion to show that as a matter of public policy there is a wide difference between allowing an employé to assume risks which are obvious, known, and appreciated, and allowing an employer to exempt himself from those which are latent, unknown, and not understood.

While it is not claimed that the appellate courts of this state have, even by direct inference, adjudicated the question now before us, there may be discovered throughout recent legislation, and in the principles from time to time affirmed by the courts, a distinct tendency to better protect the safety and health of the employés, and to strictly construe and limit agreements for the release of liability for negligent and improper conduct, which, I believe, is opposed to the approval and sustaining of such a contract as is now involved. It is a matter of common knowledge that the people of the state, through their Legislature, especially in recent years, have constantly enacted statutes designed to protect employés from injury and sickness, even though the latter themselves might have secured such protection by the terms of their contract without legislation. Of these statutes, late and familiar illustrations are the employers' liability act and the labor law, which largely increased the rights, privileges, and protection of the employé. The courts have gone a long way in upholding the constitutionality of such acts as protecting the life and welfare of a large class of its citizens, and as therefore subserving a general and public purpose of interest to the entire commonwealth.

In People v. Havnor, 149 N. Y. 195, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707, which involved consideration of the act forbidding barbers to work upon Sunday, it was said:

"It is to the interest of the state to have strong, robust, healthy citizens, capable of self-support, of bearing arms, and of adding to the resources of the country. Laws to effect this purpose by protecting the citizens from overwork, and requiring a general day of rest to restore his strength and preserve his health, have an obvious connection with the public welfare. Independent of any question relating to morals or religion, the physical welfare of a citizen is a subject of such primary importance to the state, and has such a direct relation to the general good, as to make laws tending to promote that object proper under the police power, and hence valid under the Constitution."

In like manner, and for the same reasons of general welfare and public policy, a law was held valid which provided that "no employee shall be required or permitted to work in a biscuit, bread, or cake bakery or confectionery establishment more than sixty hours in any one week," etc. People v. Lochner, 177 N. Y. 145, 69 N. E. 373, affirming 73 App. Div. 120, 76 N. Y. Supp. 396.

In Simpson v. N. Y. Rubber Co., 80 Hun, 415, 30 N. Y. Supp. 339, where a contract by an employé waiving certain risks was held invalid, it was said, Justice Cullen writing:

"The state has great interest in the protection of its members, and this even of the most utilitarian character. In the case of a maimed employé, he and his family are likely to become a public charge. The same is true of the family of an employé killed. The community would seem to have as much interest in the protection of the life and limbs of a member of it as in the question whether he should pay 8 per cent. or 6 per cent. interest. Yet by no means which human wit can devise can he make a valid contract to pay more than 6 per cent. in this state."

These examples merely serve to illustrate the principle held by the Legislature, and affirmed and approved by the courts, that the public at large have such an interest in the health, safety, and welfare of classes of its citizens that, as a matter of public policy, laws may properly be

passed securing those conditions through prescribing details of employment, even though theoretically the employed might by their own voluntary contracts secure the same privileges. . And while, obviously, the Legislature may go farther in passing statutes for the protection of employés than the courts may in condemning contracts impairing or threatening such protection, the same considerations of general wellbeing which prompt the former action are a potential argument, and often a sufficient basis, for the latter.

The general principle that contracts breaking down common-law liability and relieving persons from just penalties for their negligent and improper conduct are not to be favored, and should not be given an enforcement beyond that demanded by their strict construction, has been announced by the courts with often-repeated reiteration. Expressions of this doctrine not differing in substance from those in many other cases are found in Kenney v. N. Y. C. R. R. Co., 125 N. Y. 422, 26 N. E. 626; Pratt v. L. S. & M. S. Ry. Co., 63 Hun, 616, 18 N. Y. Supp. 682; Will v. Postal Tel. Co., 3 App. Div. 22, 37 N. Y. Supp. 933; Dow v. Syracuse, &c., R. R. Co., 81 App. Div. 362, 80 N. Y. Supp. 941. The Court of Appeals has very carefully refrained from giving its approval to a release similar in its general effect to the one here presented. In the case of Purdy v. R. W. & O. R. R. Co., 125 N. Y. 209, 26 N. E. 255, 21 Am. St. Rep. 736, such a release was offered as a defense to an action for injuries resulting from negligence. The court refused to uphold it for lack of consideration, but said further:

"In thus deciding, we do not intimate that, if the defendant had given some kind of a consideration for the paper, it would have been valid. It might then be urged that public policy forbids the exaction of such a contract from its employés by railroad and other corporations, and upon that question we desire to express no opinion at the present time."

Drawing what aid we may from the foregoing expressions and general principles, I reach the conclusion that the release from liability for his negligent acts urged by defendant is not valid, but is contrary to public policy and to those considerations of general welfare which would be impaired and endangered by permitting employés freely and without restraint and without penalty to be subjected to the dangers of negligence upon the part of their employers. The common-law liability which imposes upon the employer the exercise of reasonable care and diligence for the protection of those working under him is not too onerous, and I believe that a practice which swept it away would be a matter of public concern and detriment.

It is argued that all branches of the labor market are free and open; that the employé is entirely competent to take care of himself, and need not accept work under the risks of such a release unless he chooses to; and that, if he does choose to, it is a matter of individual interest which concerns no one else. While this argument may, perhaps, be urged with some show of force as a mere enunciation of theoretical principles, I believe that, if carried into actual and general practice, it would draw in its train many and grave evils. For many of those coming within the class denominated "employés" work is a compelling and insistent necessity, which cannot long be postponed without distress. If it came about that one of these releases was the ordinary incident of

employment, it would be demanded and accepted the same as any other usual condition. The more ignorant and the more unskilled the laborer, and therefore the more needing protection from accidents, the more readily would he yield easy submission to such an exaction. The heedless and improvident would sign without consideration of the significance of the contract, just as plaintiff claims he did in this case, and the reckless and foolhardy would trust to the future to protect him from the dangers which he assumed. In my opinion, too, the idea of an increased compensation going with the increased risk would prove illusory, and wages would be fixed without reference to the release.

Neither am I able to accept the idea that the question is one of mere individual interest. If the principle be adopted in general terms that such releases are valid, we may assume that its effect upon contracts of employment will likewise be general. At least, it may not safely be assumed that the practice of taking such contracts, if held valid, will not be general. We must decide the question presented to us upon the theory that we are not adjudicating for this particular plaintiff and defendant, but for all who may desire to take advantage of the principle which shall finally be established upon this question, and that the effect of sustaining the present release will be to say to employers as a class that, if they see fit so to do, they may procure from their employés contracts which will absolve the former from all obligations to reasonable care and prudence, and subject the latter to all the risks and dangers which will flow from indifference and carelessness. Such a policy, if adopted, and resulting in increased dangers and injuries to the lives and health of a great class of citizens, could not but be the cause of widespread harm and a matter of general concern. It is doubtless true that many employers would not exact such a contract, and that many more, even if the same were taken, would not lessen the degree of their care for the safety of their employés. But in considering this question upon the grounds suggested, we must fairly look, not upon the narrowest limitations which might be placed upon the effects of a decision holding such a release valid, but rather upon the possibilities for harm therefrom to the public. These considerations and views thus expressed seem to justify and lead to the conclusion that the release secured by the defendant should be held void as opposed to public policy, and that plaintiff's judgment should be affirmed.

Judgment and order affirmed, with costs. All concur, except STOVER, J., who dissents upon the ground that the release executed by plaintiff was valid.