Sandra C. SCHLOBOHM, et al.,
Respondents,

v.

SPA PETITE, INC., Appellant.

No. 81–1193.

Supreme Court of Minnesota.

Dec. 10, 1982.

Gilmore, deLambert, Aafedt, Eustis & Forde and John R. deLambert, Minneapolis, for appellant.

Rietz, Rietz & Rietz and Dean K. Rietz, Owatonna, for respondents.

KELLEY, Justice.

The appellant, Spa Petite, Inc., the operator of a gym or health spa run for profit, in an action for damages claiming personal injuries commenced by one of its patron-customers, moved the trial court for summary judgment relying on a clause in the membership contract between it and the plaintiff, purporting to exculpate it, its agents and employees from liability to members for personal injuries arising out of negligence. In denying the motion, the trial court held that the exculpatory clause was void as against public policy, but certified the question as important and doubtful as provided by Rule 103.03(i), Rules of Civil Appellate Procedure. We hold that the exculpatory clause here in issue is not void as against public policy, and, accordingly, reverse.

Appellant, Spa Petite, Inc. (Spa Petite), owned and operated the Spa Petite in Owatonna. In January 1976, respondent Sandra C. Schlobohm (Schlobohm) entered into a contract to become a member of Spa Petite which offered a program of weight reduction and general physical fitness through exercise. The facility has various exercise paraphernalia including a leg extension apparatus which requires the user to sit on the edge of a bench, to place the ankles under a padded bar to which weights have been attached by a pulley, and then lift the legs straight up until they are parallel with the floor.

The Spa Petite employed instructors who designed and adjusted the exercise program for each member, taking into consideration the member's individual goals. The Spa Petite represented that their instructors were trained in this sort of work. The employee-instructors received training in how to develop a "program card" and exercise techniques through classroom and on-the-job instructions.

The respondent Schlobohm signed the membership contract on her initial visit to the facility. There was no compulsion in her joining. The contract consisted of four pages, but the regulations and policies of Spa Petite were all on one page. There were 11 clauses of regulations and policies. Each was headlined by a word or phrase in uniform bold-faced type and each headline was followed by a printed regulation or policy. The print of each clause was of uniform size with that of each other clause on the page. The exculpatory clause, out of which this dispute arose and relating to accidents, read:

ACCIDENTS

It is further expressly agreed that all exercises and treatments and use of all facilities shall be undertaken by member at member's sole risk and that Spa Petite shall not be liable for any claims, demands, injuries, damages, actions or caus-

es of action, whatsoever to member or property arising out of or connected with the use of any of the services and facilities of Spa Petite or the premises where same are located, and member does hereby expressly forever release and discharge the said Spa Petite from all such claims, demands, injuries, damages, actions or causes of action, and from all acts of active or passive negligence on the part of such company, corporation, club, its servants, agents, or employees.

Before signing the membership contract, Schlobohm had the opportunity and did "somewhat" read the context of the contract.

At the time of signing the contract, Schlobohm and one of appellant's instructors developed an initial exercise program. Respondent Schlobohm notified the instructor that approximately 6 years before she had experienced some mild muscle spasm in her back for which she had received four chiropractic treatments. This fact was duly noted on her program card and was taken into consideration by the instructor in designing her exercise program.

Beginning shortly after she signed the membership contract, respondent Schlobohm used the Spa Petite facility on a regular basis until June 7, 1976. From time to time during this period her exercise program was adjusted so as to increase the difficulty of the program as a means of meeting her goal of muscle toning. Such adjustments in program were made through consultation between Schlobohm and one of appellant's instructors. It was during this period that Schlobohm began using the leg extension machine.

On June 7, 1976, while she was using the leg extension machine, an unidentified woman approached her and queried her about her program progress. This woman examined her program card, after which she recommended a change in the amount of weights being lifted from 20 pounds to 40 pounds. Schlobohm questioned the change because she had previously experienced muscle spasms—a fact noted on the top of her card.[1] After the additional weights had been added, respondent raised her legs and felt a "snap" in her back. She felt immediate pain, and shortly thereafter went to her home. The pain and subsequent discomfort remained even though she sought, on numerous occasions, chiropractic, orthopedic and neurological treatment ultimately resulting in surgery in 1980. Even after surgery, respondent Schlobohm claims to still experience problems in terms of pain and physical restrictions on activity.

Schlobohm commenced this suit, alleging that the Spa Petite was negligent. Her husband also asserted a claim for loss of consortium. After discovery, appellant moved for summary judgment on the sole ground that the exculpatory clause in the membership contract relieved it from liability. The trial court denied the motion, holding the contract to be a contract of adhesion and the exculpatory clause to be void as against public policy.[2] Although this court on numerous occasions has considered the validity of exculpatory clauses and indemnity contracts primarily in connection with construction contracts and leases,[3] we have never been called upon to decide whether an exculpatory clause in a health spa or gymnasium contract is invalid as contrary to public policy.

When considering exculpatory clauses contained in construction contracts and commercial leases, we have held that parties to a contract may, without violation of public policy, protect themselves against lia-

---

1. The previous spasms were on the right side up in the rib cage. The injury of which she now complains following the June 7, 1976 incident is in the low back below the belt line.

2. For the purpose of determining the issue here presented, we assume that Spa Petite was negligent. The record, consisting entirely of depositions, does not clearly show that the person who recommended the additional weights was an employee of Spa Petite.

3. Technically, an indemnity clause and an exculpatory clause differ in form, but the substantive effect of each to shift liability operates essentially the same under either type of contract clause, and they are usually given the same treatment by the courts.

bility resulting from their own negligence.[4] In so doing, we have noted that the public interest in freedom of contract is preserved by recognizing such clauses as valid. *Northern Pacific Railway Co. v. Thornton Brothers Co.,* 206 Minn. 193, 196, 288 N.W. 226, 227 (1939).

■ 1. Even though we have recognized the validity of exculpatory clauses in certain circumstances, they are not favored in the law. A clause exonerating a party from liability will be strictly construed against the benefited party. If the clause is either ambiguous in scope or purports to release the benefited party from liability for intentional, willful or wanton acts, it will not be enforced. Thus, we held in *Farmington Plumbing & Heating Co. v. Fischer Sand & Aggregate, Inc.,* 281 N.W.2d 838, 842 (Minn.1979), that indemnity clauses were to be strictly construed against the purported indemnitee, and that indemnity will not be created by implication. We extended that rule of strict construction to exculpatory clauses in *Solidification, Inc. v. Minter,* 305 N.W.2d 871, 873 (Minn.1981).

■ Though we have not heretofore addressed the issue, courts of other jurisdictions have held such clauses invalid if they purport to exonerate a party from willful or wanton recklessness or intentional torts. *See, e.g., Jones v. Dressel,* Colo., 623 P.2d 370, 376 (1981); *Winterstein v. Wilcom,* 16 Md.App. 130, 136, 293 A.2d 821, 824–25 (1972). An examination of the exculpatory clause in Spa Petite's contract demonstrates an absence of ambiguity. The clause specifically purports to exonerate Spa Petite

from liability for acts of negligence and negligence only. In this case, the claims of the respondents are based on negligence, and they make no claim that Spa Petite or its employees acted willfully, intentionally or wantonly. Where there is no ambiguity in the written terms of the contract, construction by a court is inappropriate. *Telex Corp. v. Data Products Corp.,* 271 Minn. 288, 294, 135 N.W.2d 681, 686 (1965). The clause in this contract being unambiguous and limited to a release of liability arising out of negligence only, we must next consider whether its enforcement in this case would contravene public policy.

2. Courts of various jurisdictions, including Minnesota, have approached the policy considerations in determining the validity of exculpatory clauses on an ad hoc case-by-case basis. An examination of the cases demonstrates the emergence of a two-prong test used by the courts in analyzing the policy considerations. Before enforcing an exculpatory clause, both prongs of the test are examined, to-wit: (1) whether there was a disparity of bargaining power between the parties (in terms of a compulsion to sign a contract containing an unacceptable provision and the lack of ability to negotiate elimination of the unacceptable provision) *North Star Center, Inc. v. Sibley Bowl, Inc.,* 295 Minn. 424, 426, 205 N.W.2d 331, 333 (1973) (per curiam),[5] *and* (2) the types of services being offered or provided (taking into consideration whether it is a public or essential service). *Jones v. Dressel,* Colo., 623 P.2d 370, 376 (1981).

In California, notwithstanding a statutory provision that seemingly on its face mandates that all exculpatory clauses in con-

---

**4.** *Independent School District No. 877 v. Loberg Plumbing & Heating Co.,* 266 Minn. 426, 434, 123 N.W.2d 793, 798–99 (1963); *Great Northern Oil Co. v. St. Paul Fire and Marine Insurance Co.,* 291 Minn. 97, 100, 189 N.W.2d 404, 407 (1971); *Speltz Grain & Coal Co. v. Rush,* 236 Minn. 1, 7, 51 N.W.2d 641, 644 (1952); *Pettit Grain & Potato Co. v. Northern Pacific Railway Co.,* 227 Minn. 225, 229–31, 35 N.W.2d 127, 130 (1948).

**5.** *See also Rogow v. United States,* 173 F.Supp. 547 (S.D.N.Y.1959) (applying New York law); *Barker v. Colorado Region-Sports Car Club of America, Inc.,* 35 Colo.App. 73, 79–82, 532 P.2d 372, 376–78 (1974); *Checkley v. Illinois Central Railway Co.,* 257 Ill. 491, 100 N.E. 942 (1913); *Lee v. Allied Sports Associates, Inc.,* 349 Mass. 544, 209 N.E.2d 329 (1965); *Allen v. Michigan Bell Telephone Co.,* 18 Mich.App. 632, 637–39, 171 N.W.2d 689, 692–93 (1969); *Ciofalo v. Vic*

tracts are against the state's public policy,[6] the courts have held that an exculpatory clause may be enforceable but only if it does not involve the "public interest." [7] These California cases were analyzed in *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 383 P.2d 441, 32 Cal.Rptr. 33 (1963), with the result that the California court concluded, after first noting that the determination of what is in "the public interest" cannot be ascertained by reference to any neat formula,[8] a number of factors bear on the determination of whether a contract is or is not affected with the public interest.[9] Although the *Tunkl* analysis of the public interest has been cited with approval in a number of jurisdictions, post-*Tunkl* cases generally consider whether there existed disparity of bargaining power and whether the service being offered is a public or essential service.[10]

3. Respondents urge, and the trial court held, that this agreement between Spa Petite and Schlobohm was a contract of adhesion. By definition, an adhesion contract is drafted unilaterally by a business enterprise and forced upon an unwilling and often unknowing public for services that cannot readily be obtained elsewhere. *See generally Jones v. Dressel*, Colo., 623 P.2d 370, 374 (1981); *Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129, 135 (4th Cir.1967). It is a contract generally not bargained for, but which is imposed on the public for *necessary* service on a "take it or leave it" basis. Even though a contract is on a printed form and offered on a "take it or leave it" basis, those facts alone do not cause it to be an adhesion contract. There must be a showing that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation

Tanny Gyms, Inc., 10 N.Y.2d 294, 297–98, 220 N.Y.S.2d 962, 965, 177 N.E.2d 925, 926 (1961).

**6.** California Civil Code section 1668 (West 1973) states: "All contracts which have for their object directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to personal property of another, or violation of law, whether willful or negligent, are against the policy of the law."

**7.** *Nichols v. Hitchcock Motor Co.*, 22 Cal. App.2d 151, 70 P.2d 654 (1937); *Barkett v. Brucato*, 122 Cal.App.2d 264, 264 P.2d 978 (1953); *Mills v. Ruppert*, 167 Cal.App.2d 58, 333 P.2d 818 (1959).

**8.** That the determination of what is in "the public interest" cannot be ascertained by reference to any neat formula, the court there acknowledged stating:
> No definition of the concept of public interest can be contained within the four corners of a formula. The concept, always the subject of great debate, has ranged over the whole course of the common law; rather than attempt to prescribe its nature, we can only designate the situations in which it has been applied. We can determine whether the instant contract does or does not manifest the characteristics which have been held to stamp a contract as one affected with the public interest.

*Tunkl v. Regents of University of California*, 60 Cal.2d 92, 98, 383 P.2d 441, 444, 32 Cal.Rptr. 33, 36 (1963).

**9.** The factors enumerated in *Tunkl* were (1) the contract concerns a business of a type general-

ly thought suitable for public regulation; (2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public; (3) the party holds himself out as willing to perform the service for any member of the public who seeks it or for any member coming within certain established standards; (4) as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public seeking his services; (5) the party confronts the public with a standardized adhesion contract of exculpation and makes no provision whereby a purchaser may pay additional fees to obtain protection against negligence; and (6) as a result of the transaction, the person is placed under control of the seller subject to risk of carelessness by the seller, his agents or employees. *Id.* at 98–101, 383 P.2d at 444–46, 32 Cal.Rptr. at 36–38.

**10.** *See, e.g., Jones v. Dressel*, Colo., 623 P.2d 370, 377–78 (1981); *First Financial Insurance Co. v. Purolator Security, Inc.*, 69 Ill.App.3d 413, 418–19, 26 Ill.Dec. 393, 388 N.E.2d 17, 21 (1979); *LaFrenz v. Lake County Fair Board*, 172 Ind.App. 389, 392–95, 360 N.E.2d 605, 607–08 (1977); *Aeropesca Ltd. v. Butler Aviation International, Inc.*, 44 Md.App. 610, 628–29, 411 A.2d 1055, 1066 (1980); *Lynch v. Santa Fe National Bank*, 97 N.M. 554, 558–60, 627 P.2d 1247, 1251–53 (Ct.App.1981); *Olson v. Molzen*, 558 S.W.2d 429, 431 (Tenn.1977).

*and* that the services could not be obtained elsewhere. *Clinic Masters, Inc. v. District Court,* 192 Colo. 120, 124, 556 P.2d 473, 475–76 (1976); *LaFrenz v. Lake County Fair Board,* 172 Ind.App. 389, 394, 360 N.E.2d 605, 608 (1977); *Ciofalo v. Vic Tanny Gyms, Inc.,* 10 N.Y.2d 294, 296–97, 220 N.Y.S.2d 962, 964, 177 N.E.2d 925, 926 (1961).

■ In our view, there was no disparity in bargaining power. Schlobohm voluntarily applied for membership in Spa Petite and acceded to the terms of membership. There was no showing that Spa Petite's services were necessary or that the services could not have been obtained elsewhere. She had the option of becoming a member in Spa Petite subject to the regulations and policies clearly set forth in the membership contract or not to do so, as she chose. It should have been obvious to anyone of Schlobohm's age, education and experience that an exercise program in a gymnasium bears with it a certain risk of injury, and that by the exculpatory clause Spa Petite indicated clearly that it was unwilling to shoulder that risk for the relatively nominal membership fee it charged its members. Nothing in the record indicates that Schlo-

bohm had been directed to participate in Spa Petite's program by any health adviser, nor that similar facilities offering similar programs were unavailable. Even if there were a scarcity of facilities for gymnastic and reducing activities in the area, that fact alone would not create such a disparity of bargaining power. *See Owen v. Vic Tanny's Enterprises,* 48 Ill.App.2d 344, 348, 199 N.E.2d 280, 282 (1964). We conclude that there was absent any disparity of bargaining power under these circumstances and that the contract was not one of adhesion. *Jones v. Dressel,* Colo., 623 P.2d 370 (1981).

■ 4. In examining whether the type of service being offered is a public or essential service, the courts consider whether it is the type generally thought suitable for public regulation. Types of services thought to be subject to public regulation have included common carriers,[11] hospitals and doctors,[12] public utilities,[13] innkeepers,[14] public warehousemen, employers[15] and services involving extra-hazardous activities.[16] In Minnesota there is no statute regulating health clubs, gymnasiums or spas. The business of Spa Petite is not the type generally thought suitable for public regulation. Courts from other jurisdictions generally

11. *See, e.g., First Financial Insurance Co. v. Purolator Security, Inc.,* 69 Ill.App.3d 413, 418, 26 Ill.Dec. 393, 388 N.E.2d 17, 21 (1979); *LaFrenz v. Lake County Fair Board,* 172 Ind.App. 389, 393, 360 N.E.2d 605, 608 (1977); *Winterstein v. Wilcom,* 16 Md.App. 130, 136, 293 A.2d 821, 824 (1972); *Ciofalo v. Vic Tanny Gyms, Inc.,* 10 N.Y.2d 294, 296, 220 N.Y.S.2d 962, 964, 177 N.E.2d 925, 926 (1961); *Leidy v. Deseret Enterprises, Inc.,* 252 Pa.Super. 162, 168, 381 A.2d 164, 167 (1977); *Moss v. Fortune,* 207 Tenn. 426, 429, 340 S.W.2d 902, 904 (1960); Annot., 175 A.L.R. 8 (1948). The prohibition against exculpatory clauses does not apply when the common carrier acts in a different capacity. *See Checkley v. Illinois Central Railway Co.,* 257 Ill. 491, 100 N.E. 941 (1913) (lessor); *Speltz Grain & Coal Co. v. Rush,* 236 Minn. 1, 51 N.W.2d 641 (1952) (lessor).

12. *See, e.g., Tunkl v. Regents of University of California,* 60 Cal.2d 92, 383 P.2d 441, 32 Cal. Rptr. 33 (1963); *Belshaw v. Feinstein,* 258 Cal. App.2d 711, 65 Cal.Rptr. 788 (1968); *Olson v. Molzen,* 558 S.W.2d 429 (Tenn.1977).

13. *See, e.g., LaFrenz v. Lake County Fair Board,* 172 Ind.App. 389, 393, 360 N.E.2d 605, 608 (1977); *Winterstein v. Wilcom,* 16 Md.App.

130, 136, 293 A.2d 821, 824 (1972); *Ciofalo v. Vic Tanny Gyms, Inc.,* 10 N.Y.2d 294, 296–97, 220 N.Y.S.2d 962, 964, 177 N.E.2d 925, 926 (1961); *Leidy v. Deseret Enterprises, Inc.,* 252 Pa.Super. 162, 168, 381 A.2d 164, 167 (1977); Annot., 175 A.L.R. 8 (1948).

14. *See, e.g., LaFrenz v. Lake County Fair Board,* 172 Ind.App. 389, 393, 360 N.E.2d 605, 608 (1977); *Winterstein v. Wilcom,* 16 Md.App. 130, 136, 293 A.2d 821, 824 (1972).

15. *Johnston v. Fargo,* 98 A.D. 436, 90 N.Y.S. 725 (App.Div.1904), aff'd 184 N.Y. 379, 77 N.E. 388 (1906); *see also First Financial Insurance Co. v. Purolator Security, Inc.,* 69 Ill.App.3d 413, 418, 26 Ill.Dec. 393, 388 N.E.2d 17, 21 (1979); *Leidy v. Deseret Enterprises, Inc.,* 252 Pa.Super. 162, 168, 381 A.2d 164, 167 (1977); Annot., 175 A.L.R. 8 (1948).

16. Though not involving an exculpatory clause, this type of activity is illustrated by a violation of a statute imposing liability for conduct such as was involved in the case of *Zerby v. Warren,* 297 Minn. 134, 210 N.W.2d 58 (1973).

have held contracts relating to recreational activities do not fall within any of the categories where the public interest is involved. *See, e.g., Barker v. Colorado Region-Sports Car Club of America,* 35 Colo.App. 73, 532 P.2d 372 (1974) (race track); *Ciofalo v. Vic Tanny Gyms, Inc.,* 13 A.D.2d 702, 214 N.Y. S.2d 99, (N.Y.App.Div.1961) *aff'd,* 10 N.Y.2d 294, 220 N.Y.S.2d 962, 177 N.E.2d 925 (1961) (membership in a gymnasium and health club); *Jones v. Dressel,* Colo., 623 P.2d 370 (1981) (clause in a contract for sky diving); *Empress Health & Beauty Spa v. Turner,* 503 S.W.2d 188 (Tenn.1973) (spa and gym); *Moss v. Fortune,* 207 Tenn. 426, 340 S.W.2d 902 (1960) (horse and saddle rental).

Further, in the determination of whether the enforcement of an exculpatory clause would be against public policy, the courts consider whether the party seeking exoneration offered services of great importance to the public, which were a practical necessity for some members of the public. As indicated above, courts have found generally that the furnishing of gymnasium or health spa services is not an activity of great public importance nor of a practical necessity. For example, in a negligence action brought against a health club and gym, the Court of Appeals of New York in *Ciofalo v. Vic Tanny Gyms, Inc.,* 10 N.Y.2d 294, 297–98, 220 N.Y.S.2d 962, 964, 177 N.E.2d 925, 927 (1961), noted:

> Here there is no special legal relationship and no overriding public interest which demand that this contract provision, voluntarily entered into by competent parties, should be rendered ineffectual. Defendant, a private corporation, was under no obligation or legal duty to accept plaintiff as a "member" or patron. Having consented to do so, it has the right to insist upon such terms as it deemed appropriate. Plaintiff, on the other hand, was not required to assent to unacceptable terms, or to give up a valuable legal right, as a condition precedent to obtaining employment or being able to make use of the services rendered by a public carrier or utility. She voluntarily applied for membership in a private organization, and agreed to the terms upon which the membership was bestowed. She may not repudiate them now.

Respondents' reliance on *Fedor v. Mauwehu Council, Boy Scouts of America, Inc.,* 21 Conn.Sup. 38, 143 A.2d 466 (1958), is misplaced. The decision in that case was bottomed on two grounds neither of which is here present. The first ground was the assertion that enforcement of the clause would act to the disadvantage of families of poor children depriving them of the advantages of a Boy Scout camp—truly a contract of adhesion. 21 Conn.Sup. at 40, 143 A.2d at 467. The second ground was the policy of the state to protect infants from acts detrimental to their rights by parents or guardians. 21 Conn.Sup. at 40–41, 143 A.2d at 467–68. Nor is the case of *Leidy v. Deseret Enterprises, Inc.,* 252 Pa.Super. 162, 381 A.2d 164 (1977), supportive of respondents' position. There, the injured patient was referred to the spa by a doctor for a specific course of treatment which was ignored. Thus, an element of compulsion or necessity existed unlike the case at bar. Moreover, Pennsylvania had a statute requiring licensing of physical therapists working in spas which, in effect, recognized that the physical therapist was a part of the medical profession. Under those circumstances, neither of which is present here, it is understandable that the clause would be analyzed and found to be invalid. *Tunkl v. Regents of University of California,* 60 Cal.2d 92, 383 P.2d 441, 32 Cal.Rptr. 33 (1963).

We conclude the exculpatory clause in the contract before us was not against the public interest. Accordingly, we reverse and hold that the exculpatory clause in Spa Petite's membership contract was unambiguous and limited to exoneration from negligence; that there was not disparity of bargaining power; and that the clause was not void as against public policy. We remand to the trial court for entry of judgment in favor of appellant on its motion for summary judgment.

Reversed and remanded for entry of judgment.

SIMONETT, Justice (dissenting).

I respectfully dissent. I would hold, as did the trial court, that the contract between the parties was a contract of adhesion between parties of disparate bargaining power and, consequently, unenforceable.

Part of the problem is that although plaintiff has the burden of proof in seeking avoidance of the exculpatory clause, she chose to rely solely on the discovery depositions in opposing defendant's motion for summary judgment, particularly her own deposition taken by defense counsel. Consequently, the circumstances relating to the contract were not fully developed nor supplemented by any affidavit. The validity of an exculpatory clause cannot be decided in the abstract.

This much, however, is clear. Ms. Schlobohm, as a prospective customer, was presented with a printed contract form, which had been prepared unilaterally by Spa Petite. Ms. Schlobohm signed the contract freely after looking it over "somewhat." The contract, a well-designed, attractive four-page printed brochure, would seem to discourage someone considering becoming a member of the health club from negotiating a change in the rules applicable for all members of the club. (At the time, Spa Petite operated not only the club at Owatonna but others in the Minneapolis area, all, apparently, with reciprocal privileges.)

No contract negotiations took place, and there is an inference at least that Ms. Schlobohm understood that membership in the club was offered on a "same as everybody else" and a "take it or leave it" basis. This inference seems reasonable, for otherwise it is difficult to understand why Ms. Schlobohm would readily agree that her presence at the spa was "at member's sole risk" and that Spa Petite would not be liable for any claim "whatsoever." It certainly seems that the parties were not really bargaining and clearly not from positions of anywhere near equal bargaining strength. And while it cannot be said that Spa Petite was offering a service "necessary" to the public in the strict sense of the word, the emphasis in its contract brochure was not on the spa as a recreational program but as a program of "community service" to promote good health. (Statistics on heart disease and low back pain are cited.) Finally, there is a finding by the trial court that defendant's facilities "were the only health-club facilities of their kind existing in Owatonna, Minnesota, at the time plaintiff Sandra C. Schlobohm executed said contract." While it appears, as the majority notes and the defendant argues, that there is no precise factual basis in the record for this finding, it does not appear that this fact is really in dispute.

Our approach to cases involving the validity of exculpatory clauses should be, as the majority says, on an *ad hoc* case-by-case basis. In this instance, it does not seem to me that the public policy favoring parties being able to make their own bargain is so compelling as to justify the dominant contracting party imposing such a far-reaching disclaimer of its own negligence.

YETKA, Justice (dissenting).

I join the dissent of Justice Simonett.

WAHL, Justice (dissenting).

I join the dissent of Justice Simonett. Furthermore, the American public is obsessed with health and physical fitness and, without question, we as a society benefit from a healthy, physically fit populace. In this context, then, the health business offers an essential public service which may well be suitable for public regulation.

TODD, Justice (dissenting).

I join the dissents of Justices Simonett and Wahl.