[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ONCT Page 10815 SL-PARTNERS IN HEALTH MOTION FOR SUMMARY JUDGMENT
In this case, the plaintiff claims to have been injured at the defendant's health club while lifting weights. As part of his application to join the fitness center, the plaintiff signed an Informed Consent and Release Agreement. The release, referring to the company operating the center and its employees and agents says:
 "I do also hereby release all of those mentioned and any others acting on their behalf from any responsibility or liability for any injury or damage to myself, including those caused by the negligent act or omission of any of those mentioned or others acting on their behalf or in any way arising out of or connected with my participation in any activities of Pfizer and SL or the use of any equipment at Pfizer."
Based on his execution of this release, the defendants have moved for summary judgment. The court in large part will rely on its decision inBashura v. Strategy Plus, Inc., et al, 21 Conn.L.Rptr. 60 (1998). There are no appellate decisions dealing with the issues raised in this case. In that opinion, the court referred to cases on this matter in 5 CO A.2d 719: "Cause of Action against Ski Area Operator for Injury or Death Occurring on Ski Slope or Ski Lift" and an ALR article which generally collected cases on the topic. The ALR article cited has been replaced by a more recent article at 54 ALR 5th 513: "Validity, Construction and Effect of Agreement Exempting Operator of Amusement Facility from Liability for Personal Injury or Death of Patron." (1997 with 2001 Supplement.)
In Bashura, this court reviewed the cases arising in this area and noted that: "[there is a sharp disagreement in the cases over what language must be included in these agreements as a prerequisite for holding that they in fact bar a claim in negligence against the owner or operator of a sports facility. Some courts require that specific language be included alerting the patron that he or she waives any claim for injury caused by the actual negligence of the facility operator." The court cited Ciofalo v. Vic Tanning Gyms, Inc., 177 N.E.2d 925, 926 (NY, 1961), for this proposition along with other cases. The court went on to say that "other courts disagree with this view. They agree that exculpatory agreements must be strictly construed but hold that the word `negligence' need not be used; the operator of a sports facility can be protected by an agreement in which the patron releases the operator from CT Page 10816 `any claim.'"
This court in Bashura, in effect, recognized the validity of certain types of these agreements when it held "the court believes that the fairer rule is expressed in the Ciofalo line of cases which require the exculpatory agreement to specifically alert the patron that he or she, by signing the waiver, is releasing the operator of the facility from injury caused by the operator's own negligence." The court reasoned that the "any and all claims" language did not make users of these facilities sufficiently aware of the enhanced exposure to a participant's risk of injury because of operator carelessness. The court then referred to a 1982 Minnesota case, Schlobohm v. Spa Petite, Inc., 326 N.W.2d 920, 923, which upheld the validity of such a waiver which barred suit for injuries caused by "all acts of active or passive negligence."
In Bashura, the court only denied summary judgment to the facility operator because the purported waiver "made no explicit reference to the operator's negligence" but only released the defendant from any and all claims arising out of the playing of a game in that case or the use of the equipment provided for the game.
As the ALR article makes clear by its reference to cases from many jurisdictions, "[i]n general, courts have enforced exculpatory agreements between proprietors of amusement facilities and their patrons, so long as there is no statutory prohibition against such clauses, the facility is not providing an essential public service, and there is not a great deal of disparity in bargaining power between the sellers and buyers of such amusements as is the case in so-called adhesion contracts," § 2, p. 528 of 54 ALR, 5th article.[1] No statute prohibits a waiver such as the one here, providing weight lifting facilities is not an essential or public service and the plaintiff makes no argument to this effect. Neither does the plaintiff point to any great disparity in bargaining positions; there is no indication that similar fitness facilities were not available elsewhere or that the plaintiff was somehow directed to use this facility, cf. Schlobohm case at 326 N.W.2d at pp. 924-925. In his affidavit, the plaintiff does not claim he was not given an opportunity to read the release language or was otherwise rushed. Thus, one of the cases cited by the plaintiff is of no assistance. DiUlio v. Goulet,2 Conn. App. 701 (1984). True, these agreements must be strictly scrutinized, but there is nothing to indicate that the format of the waiver was such that strict scrutiny should militate against contract formation.
The document that was signed was only four pages long, the "Release of Liability" section, where the language involved here is contained, is at the end of the document and the three just mentioned words are in bold, CT Page 10817 large type. The actual language of the release appears immediately above the signature block and is not buried in the middle of a lengthy document nor is the operative language in smaller type than the rest of the document that had to be signed by the plaintiff.
For all of the foregoing reasons, the court concludes that the language of the release comports with the general requirements for releases of this type and that there is no credible claim that the format of the release document or that the signing process was unfair in that it was rushed, that there was great disparity of bargaining power or that the plaintiff was somehow constrained by direction or circumstances to sign the release form.
But the foregoing discussion cannot resolve the matter. These so-called exculpatory contracts present special problems requiring a court to examine all the circumstances under which they were signed in the context of the contract language used. This court in Bashura said at page 62:
 "Whether these exculpatory agreements are defined as contracts of adhesion or not under local definitions of that term, all courts seem to say that such agreements must be closely scrutinized since they are drawn up by the sports facility and result in the surrender of an important right by a party who in fact has been injured."
The court will now try to state the problem it has as it sees it. The "Release of Liability" section in the first paragraph talks about "being allowed to participate in activities or programs and releases various parties for liability for injuries resulting in my participation in anyactivities or my use of equipment or machinery . . . or arising out of my participation in any activities at said facility." The release goes on to absolve those whose "negligent act or omission" caused injury. (Emphasis added by court.)
The following paragraph, however, is more equipment than activity focused. It says the following:
"I understand and am aware that strength, flexibility and aerobic exercise, including the use of equipment, is a potentially hazardous activity. I also understand that fitness activities involve a risk of injury and even death and that I am voluntarily participating in these activities and using equipment and machinery with knowledge of the dangers involved. I hereby agree to expressly assume and accept all CT Page 10818 risks of injury or death." (Emphasis added by the court.)
Coupled with this is the plaintiff's affidavit in opposition to the motion. In it he indicates that he underwent a fitness assessment, part of which included filling out a medical and health questionnaire and at the end of this document was the release. After the assessment he was allowed to use the gym. The following is then stated:
 "8. The people who ran the gym would provide advice on the use of the machines and would encourage us to see how much weight we could lift;
 9. The free weights were a new program that had just been started at this facility;
 10. At the time I signed the alleged release of liability the gym did not have any free weights;
 11. This was the first time I had used the free weights at the facility.
 12. The people who ran the gym would provide a spotter to make sure the weights didn't fall;
13. I had that spotter when I was injured;
 14. I relied on the spotter and trusted that he would do his job;
 15. The spotter was not paying attention and did not do his job;
 16. I never imagined anything I signed would release them from that type of negligence;
 17. If I understood that, I would not have put my trust in the spotter and relied on him."
In other words, what the plaintiff appears to argue is that at the time he signed the agreement he was not fully aware of the risks he was assuming thereby because the facility, as he knew it, did not contain the particular equipment he was using at the time of injury. Bashura did not address the problem such a fact scenario might present but was more concerned with the general issue of whether such exculpatory agreements should be enforced at all and the need for such agreements to have CT Page 10819 certain language specifically alerting a user of sports facilities that he was giving up certain rights to bring suit. In Bashura, there was no issue raised as to whether the plaintiff could have fairly appreciated the nature of the risks the particular sport involved there presented under the circumstances in which the plaintiff user was invited to participate in the sports activity.
The Restatement deals with these so-called exculpatory contracts and in § 496B of Restatement 2d Torts broadly states that:
 "A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy."
But comment d says that "[i]n order for the agreement to assume the risk to be effective, it must also appear that its terms were intended by both parties to apply to the particular conduct of the defendant which has caused the harm. Again, where the agreement is drawn by the defendant and the plaintiff passively accepts it, its terms will ordinarily be construed strictly against the defendant."
The case of Larsen v. Vic Tanny International, 474 N.E.2d 729
(Ill.App., 1984) is admittedly factually nothing like this case; there, a health club member sued the club to recover for injuries he received as a result of inhaling dangerous vapor generated by cleaning compounds used by maintenance workers. The court reversed the granting of summary judgment by the trial court and held that a material issue of fact existed as to "whether instant claim fell within the scope of exculpatory clause," id., p. 729.
However, the language of the case is interesting in its reference to the Restatement comment, quoted above, and how it uses foreseeability concepts to limit contract language — a necessity in the case of contracts requiring strict scrutiny because of the fact that important rights are being given up or one of the sides usually has greater bargaining power or the result will be that the controls usually exerted by tort law over potentially dangerous activity is being abrogated. At pages 731-732, the court said:
"Foreseeability of a specific danger is thus an important element of the risk which a party assumes, and, for this reason, serves to define the scope of an exculpatory clause. This is but another way of stating that, although the type of negligent acts from which a CT Page 10820 person expressly agrees to excuse another need not be foreseen with absolute clarity, such acts cannot lie beyond the reasonable contemplation of the parties: or, as stated in comment to the section of the Restatement of Torts (Second) recognizing the validity of express assumptions of risk: "In order for the agreement to assume the risk to be effective, it must also appear that its terms were intended by both parties to apply to the particular conduct of the defendant which caused the harm." (RESTATEMENT OF TORTS (SECOND) Sec. 496 B comment d (1977).) No agreement to assume unknown risks shall be inferred."
At another point, the court said: "A plaintiff's decision to assume the risk of injury resulting from a defendant's conduct attains efficacy only in a context in which the plaintiff may foresee the range of possible dangers to which he (she) subjects himself. thus enabling the plaintiff to minimize the risk by altering his (her) conduct in order to employ a proportionately higher degree of caution," id. p. 732.
What a plaintiff knew or could be expected to know at the time these exculpatory agreements are entered into is an important factor. Thus, inHeil Valley Ranch, Inc. v. Simkin, 784 P.2d 781 (Colo., 1989), a horse rider was injured when the horse reared up and fell on her. The court held an exculpatory agreement signed by the plaintiff barred recovery; Colorado law does not even require use of the specific term "negligence," id. p. 785. The court, however, went on to say, "When the parties adopt broad language in a release, it is reasonable to interpret the intended coverage to be as broad as the risks that are obvious to experienced participants," id. p. 785. In Heil Valley Ranch, the rider was acknowledged to be experienced and the release language in fact acknowledged the specific risks that were encountered. It said horse riding involves a risk of physical injury and "that a horse, irrespective of the training and usual past behavior and characteristics, may act or react unpredictably at times based upon instinct or fright which, likewise, is an inherent risk assumed by a horseback rider."
For this analysis and much of the language. this court relies on a federal district court case interpreting Colorado law and referring toHeil Valley Ranch. In Day v. Snowmass Stables, 810 F. Sup. 289
(D.Colo., 1993), the court denied the stables summary judgment motion in a case where the yoke ring on a rear wagon broke causing the horses to bolt, colliding with the wagon the plaintiff was riding in and causing her to be injured. The Day court said: "In this case, there is no evidence that Day had any experience with horse drawn wagons. Moreover, it is not an obvious risk that, while participating in a horse drawn CT Page 10821 wagon ride, the wagon team will become spooked because of the failure of a neck yoke ring," id. at p. 295.
Using these cases by way of analogy, it is difficult to see how a person signing one of the agreements involved in this case would have been able to foresee the risk of using equipment not even on site when the exculpatory agreement was agreed to by a user of the facility. How could the user "foresee the range of possible dangers," Larsen v. Vic TannyInternational, 474 N.E.2d at p. 732. Nor is their any indication that this plaintiff had prior experience in this type of activity and/or knowledge of all the types of equipment used in the sport. Under such circumstances, it might be argued that he should have been expected to know the risks all types of equipment presented even though the particular equipment on which he was injured was not used in the gym at the time he signed the exculpatory agreement.
It might be said that the result reached here would bar the effective use of exculpatory agreements thereby putting at risk any sports activity presenting danger and having to be run by an organized business. This is not true, however. The foregoing reasoning would not apply to activities using standard equipment or permitting use of facilities where participants would bring their own equipment, e.g. skiing, tennis, squash, motorbike or ATV parks, etc. As an added precaution, the agreements could contain language to the effect that the participant about to sign was informed of or was otherwise aware of the equipment used at the facility and with that knowledge was willing to surrender claims for injuries resulting from use of the equipment. If substantially different equipment is introduced at the facility, a new agreement could be required. Is that too burdensome? In fact, what is the argument a sports facility could present against a new agreement requirement in the new equipment situation — do not force this on us. we will not be able to trap the unwary?
The court will deny the motion for summary judgment.
Corradino, J.